**FOUNDATION ON ECONOMIC TRENDS, et al., Appellants,**

v.

**Richard LYNG, Secretary of Agriculture, et al., Appellees.**

**No. 90–5097.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 15, 1991.

Decided Sept. 6, 1991.

Karen M. Goxem, with whom Edward Lee Rogers was on the brief, for appellants.

Carol Annette Petsonk, Atty., Dept. of Justice, with whom J. Carol Williams and Elizabeth Ann Peterson, Attys., Dept. of Justice, were on the brief, for appellees.

Before BUCKLEY, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Opinion dissenting in part and concurring in the judgment filed by Circuit Judge BUCKLEY.

RANDOLPH, Circuit Judge:

"Germplasm" consists of plants, seeds and plant parts maintained for the purposes of study, breeding or genetic research. This action, begun in the district court, sought an injunction and a declaratory judgment against officials of the United States Department of Agriculture requiring them to prepare an environmental impact statement with respect to what the complaint described as the Department's "germplasm preservation program." Plaintiffs are the Foundation on Economic Trends, a private nonprofit organization active on issues of biotechnology and genetics engineering, the Foundation's president, three other individuals, and four other organizations, three of which are located in foreign countries. Judge Hogan ruled against them on the ground that they had failed to identify any "proposals for ... major Federal actions significantly affecting the quality of the human environment," without which an impact statement is not required. National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332(2)(C). Before we may consider the issues posed by that ruling, we must determine the effect of the Supreme Court's intervening decision in *Lujan v. National Wildlife Federation*, —— U.S. ——, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), on the line of decisions in this court concerning "informational injury" and on the question whether plaintiffs had standing to bring this action.

I

Agricultural systems dependent on a small number of varieties within crop species are vulnerable to crop failure due to new diseases, insects, and even common environmental stress. *See* UNITED STATES GENERAL ACCOUNTING OFFICE, REPORT TO THE SECRETARY OF AGRICULTURE, BETTER COLLECTION AND MAINTENANCE PROCEDURES NEEDED TO HELP PROTECT AGRICULTURE'S GERMPLASM RESOURCES 2 (1981). A new disease, or a disease that suddenly infects a previously resistant plant, can "spread across the entire genetically uniform plant population," causing crop failures and destroying agricultural output over wide areas. *Id.* at 2. Because United States agriculture has a narrow genetic base—the basic food crops are often limited to a few seed varieties—it could be vulnerable to genetically-based crop failure. *Id.* at 1–2. The preservation of a diverse plant genetic base is therefore of great importance to the nation's food supply. *See* THE COMPTROLLER GENERAL, REPORT TO THE CONGRESS OF THE UNITED STATES: THE DEPARTMENT OF AGRICULTURE CAN MINIMIZE THE RISK OF POTENTIAL CROP FAILURES 1–2 (1981).

For these reasons, the Agriculture Department has long been involved in efforts to preserve and expand the nation's germplasm resources. As the district court pointed out, however, "[n]o statute specifically authorizes USDA involvement in a germplasm program, sets any standards for USDA participation in such an endeavor, or in any way directs USDA to take any actions to preserve germplasm." *Foundation on Economic Trends v. Lyng*, Civ. No. 87–2909, mem. op. at 2 (D.D.C. Jan. 25, 1990). Instead, the Department has undertaken these activities on the basis of its

broad authority to conduct research "into the laws and principles underlying the basic problems of agriculture in its broadest aspects," 7 U.S.C. § 427, and its authority "to procure, propagate and distribute ... new and valuable seeds and plants." 7 U.S.C. § 2201.

The Department currently "participates in a wide variety of activities with respect to germplasm, including, but not limited to, research, preservation, storage, and technical consultation." Mem. op. at 2. It has created regional plant introduction stations and, in 1958, opened the National Seed Storage Laboratory in Ft. Collins, Colorado. These facilities were established to conserve germplasm, to foster its use in plant breeding, and to provide secure, long-term storage. The Department also participates in the National Plant Germplasm System, begun in the early 1970's as a collaborative effort among federal and state governments and the private sector. The Agriculture Department's activities, under the aegis of the Agricultural Research Service and the Cooperative State Research Service, are today the main components of the System, which has been described as a "diffuse network of laboratories and research stations" (NATIONAL RESEARCH COUNCIL, MANAGING GLOBAL GENETIC RESOURCES: THE U.S. NATIONAL PLANT GERMPLASM SYSTEM 1 (1991) (hereinafter "Report")). The System collects germplasm "through the efforts of individual scientists, governmental exchanges between gene banks, and by plant exploration. Working collections of germplasm are maintained by the user community in individual or institutional collections, at State supported collection centers, at interregional centers, at Federal Regional Plant Introduction Centers, at National Clonal Germplasm Repositories, and at the U.S. National Plant Quarantine Station." DEPARTMENT OF AGRICULTURE, ENVIRONMENTAL ASSESSMENT OF THE GERMPLASM PROGRAM OF USDA 1 (1986) (hereinafter "Environmental Assessment").

The System's "collections contain more than 380,000 different accessions of some 8,700 species, including virtually all of the crops of interest to U.S. agriculture." Report 3. "International activities are coordinated with the International Board for Plant Genetic Resources (IBPGR) and the Food and Agriculture Organization of the United Nations." Environmental Assessment 1. The System is designed to serve the user of germplasm. *Id.* Each year the System supplies more than 230,000 samples from its collection to more than one hundred nations, making it the world's largest distributor of germplasm. Report 3.

Scientists in public institutions and members of the user community carry out germplasm evaluation and enhancement activities. Environmental Assessment 1. The operations are guided by Crop Advisory Committees, composed of an interdisciplinary group of federal, state, and industry scientists. *Id.* These committees provide advice on technical aspects of germplasm activities relating to a particular commodity or group of commodities. Special technical committees are set up to advise the clonal repositories, and a variety of state-federal-industry committees coordinate activities between the regional plant introduction stations. *Id.* at 1–2. The National Germplasm Resources Board, appointed by the Secretary of Agriculture, advises on policy matters related to germplasm activities. The National Plant Germplasm Committee, consisting of administrators and scientists who advise federal, state, and private organizations, coordinates the operational activities of the System. *Id.* at 2. Financial support for the System comes from the Agriculture Department, the Department of State, various state universities, agricultural experiment stations, industry and industry associations. *Id.*

II

The Foundation filed suit against the Secretary of Agriculture in November 1985, alleging that the Department was not complying with NEPA in respect to its germplasm activities. When the Department informed the organization that it was preparing an environmental assessment, the Foundation voluntarily dismissed its complaint. After soliciting the views of

the Foundation and others, the Department completed its assessment in November 1986 and issued a finding that its germplasm activities did not have a significant environmental effect. Plaintiffs filed this action one year later, invoking jurisdiction under 28 U.S.C. § 1331, and seeking judicial review under the Administrative Procedure Act (APA), 5 U.S.C. §§ 702–706, of the Department's failure to prepare an impact statement under NEPA.

Among other things, the complaint contained the following allegations. The Department had been "taking the major federal actions of collection, storage, labeling, distribution, and other related actions pertaining to plant germplasm and affecting its potential preservation, loss, deterioration and/or destruction." Complaint ¶ 21. "The overwhelming importance of the preservation of germplasm diversity and abundance to the welfare of mankind is well documented and can hardly be overstated.... Accordingly, it is essential that a well conceived and adequately financed germplasm preservation program be developed as promptly as possible." Complaint ¶ 23. "[T]here are serious financial, practical, logistical, and institutional problems hampering the development of an adequate germplasm preservation program for this country." Complaint ¶ 27. "There is also a great need to develop better priorities for making collections both here and abroad." Complaint ¶ 29. "The NSSL is understaffed and does not maintain adequate sample sizes for many accessions." Complaint ¶ 31.

On cross-motions for summary judgment, the district court held that the plaintiffs had failed to identify "a particular proposal for federal action" or "any revisions or changes taken by the defendants in the germplasm program that would trigger the obligation to prepare an environmental impact statement under NEPA." Mem. op. at 9. The court also concluded that the Department's preparation of the environmental assessment did not amount to any concession with respect to NEPA because, in the absence of a proposal for major federal action, the Agriculture Department had simply done more than the

statute required. Because plaintiffs had failed to state a cause of action under NEPA, the court dismissed the case in its entirety.

## III

The district court said nothing about plaintiffs' standing, doubtless because defendants did not contest it. After the court granted summary judgment, the Supreme Court handed down its decision in *Lujan v. National Wildlife Federation,* reversing the decision of this court in *National Wildlife Federation v. Burford,* 878 F.2d 422 (D.C.Cir.1989). Defendants now argue that in light of *National Wildlife Federation* plaintiffs had no right to judicial review under section 702 of the APA. While this might be thought to warrant a remand, so that the district court could consider the matter in the first instance, the Supreme Court has instructed courts of appeals to decide for themselves whether the party seeking judicial review has standing, even if the issue was not decided below or raised on appeal. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 607–08, 107 L.Ed.2d 603 (1990).

■ In 1953, Justice Frankfurter described the doctrine of standing as a "complicated specialty of federal jurisdiction, the solution of whose problems is ... more or less determined by the specific circumstances of individual situations...." *United States ex rel. Chapman v. FPC,* 345 U.S. 153, 156, 73 S.Ct. 609, 612, 97 L.Ed. 918 (1953). Since then, the law of standing has become no less intricate, as this case demonstrates. There is first the need to satisfy the minimum requirements of Article III of the Constitution. To this end, a party seeking judicial relief must show (1) an injury in fact, (2) fairly traceable to the challenged action, and (3) likely to be redressed by a favorable decision. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Warth v. Seldin,* 422 U.S. 490, 499–501, 95 S.Ct. 2197, 2205–2206, 45 L.Ed.2d 343 (1975). When

the party seeks judicial review of agency action under the general review provision of the APA (5 U.S.C. § 702), as the plaintiffs have in this case, there are two related requirements. The plaintiff must identify the "agency action" affecting his interests and must demonstrate that the "interest sought to be protected ... is arguably within the zone of interests to be protected or regulated by the statute." *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). *See Air Courier Conf. v. American Postal Workers Union*, —— U.S. ——, 111 S.Ct. 913, 917–20, 112 L.Ed.2d 1125 (1991); *National Wildlife Fed'n*, 110 S.Ct. at 3182.

■ In the typical NEPA case, brought by an organization claiming that an agency improperly refused to prepare an environmental impact statement or prepared an inadequate one, standing is established derivatively, through the organization's members.[1] The organization usually alleges that the environmental, recreational, or aesthetic interests of its members would suffer if some particular agency activity or program were undertaken and that if the agency prepared an impact statement (and considered it) before implementing its plans, it might change its mind and thereby avert the damage to those interests.[2] In such cases, among which *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), is the principal example, the alleged injury arises directly from the agency's proposed action rather than from the agency's failure to create or consider an impact statement. *See also Committee for Auto Responsibility v. Solomon*, 603 F.2d 992, 998 (D.C.Cir.1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980); *Public Citizen v. National Highway Traffic Safety Admin.*, 848 F.2d 256, 263 n. 27 (D.C.Cir.1988); *City of Los Angeles v. National Highway Traffic Safety Admin.*, 912 F.2d 478, 495–96 (D.C.Cir.1990).

Plaintiffs here rest their standing to sue on a different basis. They say that in NEPA cases, this court has recognized another type of standing for organizations engaged in disseminating environmental information.[3] The idea of this "informational standing" can be traced to a footnote in *Scientists' Institute for Public Information, Inc. (SIPI) v. Atomic Energy Commission*, 481 F.2d 1079, 1086–87 n. 29 (D.C.Cir.1973), observing that the plaintiff organization might have standing because it distributed scientific information to the public, an activity adversely affected by the agency's failure to provide an impact statement. The court's statement in *SIPI*, inaccurately described as a holding in *Sierra Club v. Andrus*, 581 F.2d 895, 900 n. 16 (D.C.Cir.1978), *rev'd on other grounds*, 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979), was unnecessary to the decision. *See Competitive Enterprise Institute v.*

---

**1.** *Compare Sierra Club v. Morton*, 405 U.S. 727, 739–40 & nn. 14–15, 92 S.Ct. 1361, 1368–69 & nn. 14–15, 31 L.Ed.2d 636 (1972).

**2.** NEPA does not require that any particular substantive action be taken in response to the environmental impact statement. The statute merely requires that the agency consider the statement and that it be made available to legislators, agencies, and the public so that environmental concerns will be adequately taken into account. *See Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (per curiam); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

**3.** According to plaintiffs, the "allegations of informational injury in [their] complaint are sufficient under the relevant law of this circuit to demonstrate standing to maintain this action."

Reply Brief at 15. The allegations are as follows (Complaint ¶¶ 11, 12):

11. The organizational interests of plaintiffs FET, ICDA, IASA, NFU and UDI are adversely affected in that their abilities to conduct their educational and other organizational activities and to protect and promote the interests of themselves and their members are hampered by the lack of information, as well as the absence of corrective actions, that would be provided by the Department were it to comply with the National Environmental Policy Act (NEPA) as requested.

12. The individual plaintiffs are adversely affected in much the same way as are those of the organizational plaintiffs—the lack of information resulting from the failure to comply with NEPA impedes their abilities to carry out their professional activities in the germplasm area.

*National Highway Traffic Safety Admin.,* 901 F.2d 107, 123 (D.C.Cir.1990). When the issue arose again, in *Natural Resources Defense Council v. SEC,* 606 F.2d 1031 (D.C.Cir.1979), the court approached the *SIPI* footnote with caution. Whether lack of information constituted injury in fact in a NEPA case involved "complex and difficult considerations." 606 F.2d at 1042 n. 6. Finding it unnecessary to decide the question, the court expressed no further views on the subject.

Thereafter, *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 937 (D.C.Cir.1986), a case not involving NEPA, held that organizations devoted to advising senior citizens about age discrimination and other matters had standing to challenge regulations restricting the flow of public information from the Department of Health and Human Services about compliance with the Age Discrimination Act of 1975, 42 U.S.C. § 6101 *et seq.* The court identified the organizations' injury as the "alleged inhibition of their daily operations." 789 F.2d at 938.

The next step occurred in *National Wildlife Federation v. Hodel,* 839 F.2d 694 (D.C.Cir.1988). Citing *Action Alliance* and the dicta in *SIPI,* the court stated that "for affiants voicing environmental concerns ... the elimination of the opportunity to see and use an EIS prepared under federal law does constitute a constitutionally sufficient injury on which to ground standing." *Id.* at 712. Plaintiffs were not, however, challenging any particular violation of NEPA. Their complaint was aimed at the Interior Department's decision to delegate its authority to approve mining plans on federal lands to the states, a function requiring impact statements when performed by federal authorities. Apparently, individual members of the plaintiff organizations wanted the Department to compile environmental information in impact statements so that they could use the data to contest the opening of new mines. The court thus identified the "injury in fact" as the impairment of several individuals' "ability to evaluate and oppose future mining." *Id.*

*Competitive Enterprise Institute v. National Highway Traffic Safety Administration,* 901 F.2d at 122, posed the issue somewhat differently. The plaintiff organizations rested their standing to sue on the ground that their ability to inform their members and the public had been impaired by the agency's refusal to create public information in the form of an impact statement. The court responded: "Allegations of injury to an organization's ability to disseminate information may be deemed sufficiently particular for standing purposes where that information is essential to the injured organization's activities." *Id.* The court nevertheless held that the organizations in *Competitive Enterprise* lacked standing. The organizations wanted an impact statement created so they could use the information in it to inform the public about traffic fatalities. The court viewed this as a "nonenvironmental issue," and therefore "outside the sphere of any definition of injury adopted in NEPA cases." 901 F.2d at 123.

Despite the general statements in our decisions, particularly *National Wildlife Federation v. Hodel* and *Competitive Enterprise,* we have never sustained an organization's standing in a NEPA case solely on the basis of "informational injury," that is, damage to the organization's interest in disseminating the environmental data an impact statement could be expected to contain. We recognize the logical appeal of doing so in terms of the three constitutional standing requirements: if the *injury in fact* is the lack of information about the environmental impact of agency action, it follows that the injury is *caused* by the agency's failure to develop such information in an impact statement and can be *redressed* by ordering the agency to prepare one. Such a broad approach, however, raises "complex and difficult considerations" (*Natural Resources Defense Council v. SEC,* 606 F.2d at 1042 n. 6). It would potentially eliminate any standing requirement in NEPA cases, save when an organization was foolish enough to allege that it wanted the information for reasons having nothing to do with the environment. The proposition that an organization's de-

sire to supply environmental information to its members, and the consequent "injury" it suffers when the information is not forthcoming in an impact statement, establishes standing *without more* also encounters the obstacle of *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The Supreme Court there held (405 U.S. at 739, 92 S.Ct. at 1368) that "a mere 'interest in a problem,' no matter how long-standing the interest and no matter how qualified the organization is in evaluating the problem," is not sufficient to confer standing. It is not apparent why an organization's desire for information about the same environmental problem should rest on a different footing. We also have trouble seeing how "informational standing" could be confined to organizations. If one of NEPA's purposes is to provide information to the public, any member of the public—anywhere—would seem to be entitled to receive it. Yet *United States v. Richardson,* 418 U.S. 166, 176–80, 94 S.Ct. 2940, 2946–48, 41 L.Ed.2d 678 (1974), rejected a similar claim of informational standing on the ground that the effect on the plaintiff there from the lack of information was undifferentiated and common to all members of the public. *See* Note, *Informational Injuries as a Basis for Standing,* 79 Colum.L.Rev. 366, 376–80 (1979). Furthermore, "informational injury," in its broadest sense, exists day in and day out, whenever federal agencies are not creating information a member of the public would like to have. If such injury alone were sufficient, a prospective plaintiff could bestow standing upon itself in every case merely by requesting the agency to prepare the detailed statement NEPA contemplates, which in turn would prompt the agency to engage in "agency action" by failing to honor the request.

■ The issues thus presented by the Foundation's claim of standing are, however, unnecessary to decide in view of the Supreme Court's decision in *National Wildlife Federation.* Like the Supreme Court, we shall assume that the Foundation has adequately alleged "injury ... through the deprivation of information" (110 S.Ct. at 3194). In other words, we shall suppose that the Agriculture Department's failure to prepare an impact statement with respect to the germplasm program has injured the Foundation because its mission is to provide information to its members and the general public about such matters. *Id.* at 3193. Also, we shall assume, as the Supreme Court did, "that providing information to organizations such as [the Foundation] was one of the objectives of [NEPA] ...," so that [the Foundation] is 'aggrieved within the meaning' of [NEPA]." *Id.* at 3194.

Even in light of such assumptions, the Supreme Court in *National Wildlife Federation v. Lujan* held that the plaintiff organization had not sufficiently established its "right to seek judicial review" under section 702 of the APA. *Id.* By way of explanation, the Court stated that the organization had "fail[ed] to identify any particular 'agency action' that was the source of these injuries." *Id.* One might wonder why the "source" of the informational injuries was not the obvious one—namely, the agency's refusal to prepare an impact statement, which the National Wildlife Federation's complaint had clearly identified as the cause of that harm. *National Wildlife Fed'n v. Burford,* Civ. No. 85–2238, Amended Complaint at ¶ 6 (filed Aug. 19, 1985). The Court appeared to have something else in mind as a condition to review under section 702 of the APA in a NEPA case. Although the Court did not explicitly say as much, the opinion indicates that plaintiffs in NEPA cases must point to "action" at least arguably triggering the agency's obligation to prepare an impact statement. In the Court's words, there must be "an identifiable action or event" rather than merely the general "day-to-day operations" of the agency (110 S.Ct. at 3194). We read this portion of the opinion as demanding that the "identifiable action or event," in the context of NEPA, be a "major Federal action[ ] significantly affecting the quality of the human environment," within the meaning of 42 U.S.C. § 4332(2)(C). We recognize that this tends to merge standing under the APA with the merits of a plaintiff's NEPA claim. But

such a result is not an uncommon consequence of applying the standing test for APA review set forth in *Data Processing*, 397 U.S. at 153, 90 S.Ct. 827 at 830. *See* S. BREYER & R. STEWART, ADMINISTRATIVE LAW AND REGULATORY POLICY 1094 (2d ed. 1985). At all events, we believe our interpretation of *Lujan v. National Wildlife Federation* is more plausible than the alternative reading—namely, that the plaintiff organization had merely failed to reiterate the obvious point that the source of its informational injury was the agency's failure to do an impact statement.

In light of our interpretation of *National Wildlife Federation*, examination of the record in this case leads us to conclude that plaintiffs lack standing. Their basic claim is that the Agriculture Department's "germplasm preservation program" constitutes a major federal action having significant impacts on the human environment and that the manner in which the Department is managing this program does not adequately preserve germplasm. This strikes us as no different than the contentions of the respondent in *National Wildlife Federation*. The "germplasm preservation program" is no more an "identifiable action or event" (110 S.Ct. at 3194) than the "Land Withdrawal Review Program." The Supreme Court warned against "general judicial review of [an agency's] day-to-day operations" (*id.*) and of allowing litigants to "seek *wholesale* improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made" (*id.* at 3190 (emphasis in original)). Although *National Wildlife Federation* had not yet been decided, Judge Hogan used strikingly similar language when he found that plaintiffs were seeking "judicial involvement in day-to-day decision-making of the USDA. They attack a broad program, involving a wide array of activities, and assert that the daily operation of that program should be handled differently. Plaintiffs fail to target their complaint to a particular proposal for federal action and fail to identify any revisions or changes taken by any of the defendants in the germplasm program that

would trigger the obligation to prepare an environmental impact statement under NEPA. Additional funding and staff, improved procedures, and computerization, all identified by the plaintiffs as needed improvements in the germplasm program, are matters within the discretion of the agency, not proposals for major federal action." Mem. op. at 9.

Plaintiffs had described the Agriculture Department's action for which they sought an impact statement only in the most general terms—the "collection, storage, labeling, distribution, and other related actions pertaining to plant germplasm under the National Plant Germplasm System (NPGS) and those actions affect[ing] the potential preservation, loss deterioration and/or destruction of plant germplasm." Plaintiff's Memorandum of Points and Authorities in Support of their Motion for Summary Judgment at 5 (filed July 25, 1988). As in *National Wildlife Federation*, 110 S.Ct. at 3191, "the many individual actions referenced" in the record, "and presumably actions yet to be taken as well—cannot be laid before the courts for wholesale correction," even if one happens to be ripe for review and is adversely affecting one of the plaintiffs or its members. It is of no moment that the Agriculture Department referred to its germplasm activities as a "program" when it prepared its Environmental Assessment. The Supreme Court in *National Wildlife Federation* stressed that merely because agency activities are termed a "program" does not mean there is "identifiable 'final agency action'" for purposes of the APA." 110 S.Ct. at 3189–90 n. 2. The problem is that plaintiffs failed to identify final agency action, not that they failed to identify a "program."

■ Judge Hogan placed his decision on the merits, concluding that plaintiffs had not established the existence of a proposal for major federal action that would trigger NEPA's requirement of an impact statement. But his ruling fully supports the conclusion that under *National Wildlife Federation*, plaintiffs failed to identify any particular "agency action" within the meaning of section 702 of the APA suffi-

cient to entitle them to judicial review. For that reason, the complaint should have been dismissed for lack of subject matter jurisdiction. As we have indicated, plaintiffs seeking judicial review under section 702 of the APA for an alleged violation of NEPA and claiming only an "informational injury" must show the *particular* agency action—in addition to the agency's refusal to prepare an impact statement—that allegedly triggered the violation and thereby caused the injury. In this case, neither the complaint nor the materials plaintiffs submitted on summary judgment satisfied this requirement.

The judgment of the district court is vacated and the case is remanded with instructions to dismiss the complaint for lack of jurisdiction.

BUCKLEY, Circuit Judge, dissenting in part and concurring in the judgment:

I cannot join in the majority's analysis because it reads too much into the Supreme Court's opinion in *Lujan v. National Wildlife Federation*, — U.S. —, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990), and creates, under the circumstances of this case, an unnecessary "merge[r of] standing under the APA with the merits of a plaintiff's NEPA claim." Maj. op. at 85. I believe the plaintiffs have alleged the necessary elements to establish informational standing and a right to judicial review under section 702 of the APA, 5 U.S.C. § 702 (1988). I would affirm the district court, however, on the ground that plaintiffs have failed to state a claim under section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) (1988).

A. Justiciability

There are two essential parts to the majority's holding: First, in a suit alleging a violation of NEPA's section 102(2)(C), the Supreme Court "demand[s]" that the "agency action" required for judicial review under section 702 be the "major Federal action[ ] significantly affecting the quality of the human environment" whose proposal triggers the obligation to prepare an environmental impact statement ("EIS"). Maj. op. at 85. Second, the USDA's germplasm preservation program is not a sufficiently identifiable action or event to qualify as either "agency action" under section 702 or "major Federal action[ ]" under NEPA. *Id.* at 85–87. The first proposition cannot possibly be correct; the second we need not decide.

Sections 702 and 704 of the APA set out three conditions necessary for judicial review of an agency's affairs. The first is procedural: There must be an identifiable "agency action" that is to be the subject of the court's review. 5 U.S.C. § 702. Strictly speaking, this is not a standing requirement because it does not relate to the person bringing suit. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 484, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982) (standing focuses on party bringing complaint). The second condition is an aspect of ripeness or exhaustion: Where the substantive statute at issue does not provide for judicial review, the agency action must be "final." *Id.* § 704. The third condition is standing, both constitutional and prudential: The plaintiff must be "adversely affected or aggrieved by" the agency action, and his injury must be cognizable "within the meaning of [the] relevant statute," *id.* § 702, that is, it must fall within the "zone of interests" sought to be protected by the statute, *National Wildlife Fed'n*, 110 S.Ct. at 3186.

*National Wildlife Federation* simply clarifies the degree of factual specificity with which the plaintiff must allege each of these conditions when his right to judicial review is attacked on summary judgment. The Court's discussion of "agency action" does not undermine our informational standing cases. As one commentator has said, "[*National Wildlife Federation*] does not change existing standing rules but may make it more difficult for NEPA plaintiffs to survive a standing challenge at summary judgment stage." D. Mandelker, *NEPA Law and Litigation* ch. 4, at 1 (Supp.1990).

The Court in *National Wildlife Federation*, in fact, assumed the validity of the

plaintiff organization's claim of informational standing, but concluded that the organization had failed "to identify any particular 'agency action' that was the source of" its informational injuries. 110 S.Ct. at 3194. The only "action" the National Wildlife Federation had alleged was "the failure" of the agency "to provide adequate information and opportunities for public participation." *Id.* (internal quotes omitted). Obviously, such a generalized "failure" is not a final decision, order, or ruling on which a court can focus its review authority under the APA. Without such a focus, the court would be undertaking "a general judicial review of the [agency's] day-to-day operations." *Id.*

Here, by contrast, we are called upon to review a specific, readily identifiable final agency decision: the USDA's November 21, 1986, finding of no significant impact ("FONSI"). Based on the conclusions reached in its own "Environmental Assessment of the Germplasm Program of USDA," Joint Appendix ("J.A.") at 92, the agency found that its "activities in the area of germplasm collection, maintenance, evaluation, and distribution" would "not have a significant environmental impact within the purview of [NEPA]," *id.* at 91. There is no reason why the issuance of this FONSI cannot constitute "agency action." The FONSI was the USDA's "final disposition" of whether to prepare an EIS for its ongoing germplasm program. *See* 5 U.S.C. § 551(6) (defining "order" as "a final disposition"); *id.* § 551(13) (defining "agency action" to include any "order"). Thus, there is a sufficient focus for the judicial function: We could properly decide whether the USDA's FONSI was "arbitrary [or] capricious" under section 706. *Cf. Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 375–76, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989) (applying arbitrary-and-capricious standard of review to "agency decision" not to prepare a supplemental EIS for an existing project).

Our requirements for informational standing under NEPA are set out in *Competitive Enterprise Institute v. NHTSA,* 901 F.2d 107, 122–23 (D.C.Cir.1990). I believe that the Foundation's general averments of concrete harm to its programmatic interests in disseminating information on the degradation of the human environment (in this case, the diversity of the germplasm supply) are sufficient to establish injury-in-fact that is within NEPA's zone of interests. *See id.* at 123. The Foundation's standing was not challenged on summary judgment before the district court; hence, our review of the pleadings and other allegations relating to standing need not meet the heightened standard applied in *National Wildlife Federation.* See Haase v. Sessions, *835 F.2d 902, 907 (D.C.Cir.1987). Section 702 is satisfied because the FONSI is the identifiable agency action that "was the source of" the plaintiffs' informational injury, as required in* National Wildlife Federation, *110 S.Ct. at 3194. When the focus is on informational standing, the action that has aggrieved the plaintiff organization may logically be the agency's final decision not to prepare an EIS.*

The majority reads *National Wildlife Federation* to require more, based on the Court's statement that a plaintiff organization cannot simply claim that an agency's entire "program" is the source of its informational injury where that program "is not an identifiable action or event." *Id.; see* Maj. op. at 85. The majority takes this rather inexact statement to signify that the necessary "agency action" for NEPA purposes must always be the "program" itself, where the plaintiffs, as here, claim that some ongoing program is major federal action (*see* 40 C.F.R. § 1508.18(b)(3) (defining major federal action to include "a group of concerted actions to implement a specific policy or plan")). This conclusion then leads the majority into the contortion of arguing that the USDA's germplasm activities are not sufficiently concerted to be a "program," even though the USDA itself in its environmental assessment and FONSI treated the activities as an interrelated project, *see* J.A. at 91–92. As standing was not challenged until appeal, we should not resolve the fact-dependent "program" question against the plaintiffs as part of the standing inquiry, especially

when the USDA seems to believe in the existence of a "Germplasm Program," *id.* at 92.

The "source of the injury" problem in *National Wildlife Federation,* I believe, was due in part to the lack of a FONSI. Absent a FONSI, the question of judicial review under section 702 inevitably overlaps with the "proposal" requirement in NEPA. Under section 102(2)(C), "the moment at which an agency must have a final [EIS] ready 'is the time at which it makes a recommendation or report on a *proposal* for federal action.'" *Kleppe v. Sierra Club,* 427 U.S. 390, 406, 96 S.Ct. 2718, 2728, 49 L.Ed.2d 576 (1976) (quoting *Aberdeen & Rockfish R.R. v. SCRAP,* 422 U.S. 289, 320, 95 S.Ct. 2336, 2356, 45 L.Ed.2d 191 (1975) (emphasis in original)). Correspondingly, "the time at which a court enters the process [via section 702] is when the report or recommendation on the proposal is made, and someone protests either the absence or the adequacy of the final impact statement. This is the point at which an agency's action has reached sufficient maturity to assure that judicial intervention will not hazard unnecessary disruption" to the agency's "day-to-day decisionmaking process." *Id.* 427 U.S. at 406 & n. 15, 96 S.Ct. at 2728 & n. 15. Where the agency has issued a FONSI, there need be no threshold "proposal" inquiry. The FONSI is a discrete final agency action that may cause an informational injury and may therefore trigger judicial review, even if the court ultimately concludes on the merits that there has been no "recommendation or report on a proposal for federal action."

If the USDA had ignored the plaintiffs' demands and had not undertaken an environmental assessment or issued a FONSI, I would agree that plaintiffs could not gain judicial review until they identified some "recommendation or report on [a] proposal[ ]" under NEPA. But equating the "agency action" that is the sine qua non of judicial review with the "major Federal action[ ]" allegedly proposed by the agency goes much too far. As we have said,

NEPA was designed to ensure that "important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." The need to fully assess potential harm *before* a project is undertaken is a major justification for the broad test courts have laid down for NEPA standing.

*City of Los Angeles v. NHTSA,* 912 F.2d 478, 492 (D.C.Cir.1990) (citation omitted) (emphasis in original) (quoting *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989)). *See also Marsh,* 490 U.S. at 371, 109 S.Ct. at 1858 ("the broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action *at a meaningful time*") (emphasis added). All that NEPA requires is a "proposal." The "major Federal action[ ]" itself may be years away. Withholding judicial review until there is final agency approval of the proposed action would effectively eliminate judicial oversight of NEPA's procedural requirements. *National Wildlife Federation* does not require that result.

### B. The Merits

Having concluded that the Foundation has adequately established organizational standing based on an injury to its informational interests cognizable under NEPA and that the USDA's FONSI is the agency action that caused that injury, I would nevertheless affirm on the merits.

In their complaint, plaintiffs allege that "[t]his country and the entire world face a crisis because of the eroding plant gene pool." Complaint for Declaratory and Injunctive Relief ¶ 22, J.A. at 15. This crisis is caused by "developmental and agricultural forces and pressures" that have resulted in the "widespread and irretrievable destruction [of germplasm] in its natural environment." *Id.* ¶ 23, J.A. at 16. "Accordingly," they allege, "it is essential that a well conceived and adequately financed germplasm preservation program be developed as promptly as possible," *id.;* unfortunately, the USDA's germplasm efforts are inadequate. "Because of the [de-

ficiencies] of the program," plaintiffs claim, "actions by the [USDA] under the program have jeopardized the survival of certain varieties of germplasm of importance...." *Id.* ¶ 34, J.A. at 21. Plaintiffs also assert that the USDA has violated NEPA by "fail[ing] to consider and develop alternative approaches to the design of [the] germplasm preservation program" that would achieve more effective preservation. *Id.* ¶ 42, J.A. at 23–24.

To the extent the plaintiffs are concerned with the general loss of germplasm and the USDA's alleged failure to prevent it, they have failed to state a claim under NEPA because they have not alleged that the USDA's program is the proximate cause of the environmental effects they fear. The Supreme Court has counseled that "the terms 'environmental effect' and 'environmental impact' in § 102 ... include a requirement of a reasonably close causal relationship between a change in the physical environment and the effect at issue." *Metropolitan Edison Co. v. PANE*, 460 U.S. 766, 774, 103 S.Ct. 1556, 1561, 75 L.Ed.2d 534 (1983). If the causal chain between the impact on the physical environment from the agency's action and the environmental effect at issue "is too attenuated," that alleged effect will "not fall within § 102." *Id.* According to the plaintiffs, the degradation of genetic diversity that threatens the food supply is caused by "developmen-

tal and agricultural forces and pressures" throughout the world; it cannot be said that the alleged inadequacies in the USDA's preservation work are the proximate cause of such degradation. The causal connection is "too attenuated."

To the extent the plaintiffs are concerned with the direct environmental effects that the alleged deficiencies have had on the germplasm physically held in the project's national repositories or affected by its activities, I would affirm the dismissal of their complaint for the reasons given by the district court. Deficiencies that are part of the status quo in an ongoing program do not by themselves fulfill the "proposal" requirement. There must be a decisionmaking process in motion such that the agency "is actively preparing to make a decision on one or more alternative means of accomplishing" its goal. *See* 40 C.F.R. § 1508.23. The plaintiffs have failed to allege the existence of such a focused process. They would like the USDA to initiate an overhaul of its program, but NEPA cannot be used to achieve that agenda.