H & F ENTERPRISES, LTD, Plaintiff,

v.

UNITED STATES of America,
et al.   Defendant.

No.  Civ.  A.  95–1830(EGS).

United States District Court,
District of Columbia.

Oct. 17, 1996.

Michael L. Martinez, Holland & Knight, Washington, D.C., for plaintiff.

Suzanne C. Nyland, Asst. U.S. Atty., Washington, D.C., for defendant.

### MEMORANDUM OPINION

SULLIVAN, District Judge.

This matter is before the Court on the parties' cross-motions for summary judgment

pursuant to Fed.R.Civ.P. 56(c). Upon consideration of the undisputed facts, relevant statute, regulations and case law, and the record herein, the defendant's motion for summary judgment is **GRANTED** and the plaintiff's motion for summary judgment is **DENIED**.

## I. FACTS

The Department of Veterans Affairs ("VA") regional office in Waco, Texas, currently occupies 87,111 square feet of office space in a facility owned by the plaintiff H & F Enterprises ("H & F"). The lease with H & F for use of this facility was entered into in 1964 and was due to expire on July 31, 1995.[1]

In the spring of 1991, the defendant General Services Administration ("GSA") began its initial review of the Waco VA office space needs and determined that extensive renovation and expansion of the thirty-year-old building currently used by the VA regional office would be required to meet the VA's future office needs. In October 1991, GSA inquired into the Waco VA Office's continuing space requirements and also met with Waco city officials to discuss the procurement and the availability of a city-owned site in the centralized community business area ("CBA").[2]

On January 31, 1992, Waco VA Director Alonzo Poteet sent their recommendations to the VA Central Office in Washington, D.C., requesting that potential locations be within "the downtown Waco district." Prior to receipt of the VA's official requirements, GSA encouraged the VA central office to request as large a delineated area as possible in order to maximize competition. On March 10, 1992, the VA central office submitted to GSA a formal request for 95,000 (later amended to 116,500) square feet within "Metropolitan Waco." The H & F site was included in this official delineated area.

GSA published an advertisement in the Waco Tribune–Herald advertising for poten-

tial sites. Nine sites were submitted to GSA for consideration in response to its advertisement. GSA conducted a market survey of the sites which revealed that only five of the sites were potentially capable of meeting the VA's needs. The five sites consisted of plaintiff's facility, located outside of the CBA, and four parcels of property, located in the CBA, where a new building would need to be constructed. Plaintiff's facility, while potentially capable of meeting VA's needs, would require extensive and expensive renovations and remodeling to bring the space up to meet current health, fire and safety regulations, including handicap accessibility.

On June 22, 1992, GSA Real Estate Division Director Leonard Murphy had discussions with VA Regional Director Poteet as well as officials from the VA central office. During the meeting, GSA discussed Executive Order ("E.O.") 12072 and advised VA that in selecting a site for the VA facility, first consideration must be given to the CBA of Waco unless the VA had a mission-related justification for a location outside of the CBA. Mr. Poteet stated that VA's regional office could operate in the CBA.

On September 29, 1992, Mr. Murphy and Betty King, GSA Contracting Officer, then met with the new VA Regional Office Director, Lois High, on September 29, 1992. GSA again informed the VA that E.O. 12072 required first consideration of the CBA unless the VA could provide a "mission-related" justification for a non-CBA site. No VA officials gave any reason as to why the Waco VA office could not be located within the CBA.

On October 8, 1992, Lois High wrote to GSA expressing her concerns that competitive procedures be used and that GSA be more responsive to the VA regional office's needs. Mr. Murphy responded on October 21, 1992, that the VA facility would be located on a site selected by GSA in the Waco CBA, the construction and lease-back of which would be competitively bid out. J.C.

---

1. In a supplemental lease agreement dated April 14, 1995, the lease was extended until July 31, 1998, with GSA holding the right to terminated the lease at any time after July 31, 1997 upon giving 180 days of written notice.

2. Documents in the administrative record use CBA interchangeably with centralized community business district ("CBD").

Snead, H & F Managing Director, was notified by a letter dated November 4, 1992 that GSA planned to pursue a lease construction project on a site within the CBA. On December 8, 1992, H & F submitted a formal protest to the General Accounting Office ("GAO").

On January 13, 1993, GSA Assistant Regional Administrator Earl Eschbacher, Jr. wrote to H & F stating that no final decision had been made, that its facility had not been excluded from the bid process and that all previous correspondence suggesting otherwise should be disregarded. On January 15, 1993, the GAO dismissed H & F's protest as premature.

In a letter dated January 25, 1993, GSA informed the VA that it had decided to select a CBA site for the new VA regional office. Plaintiff was informed of this decision on March 4, 1993. On March 10, 1993, H & F filed a second protest with the GAO. In a July 13, 1993 decision, GAO denied plaintiff's protest finding that GSA's decision to limit consideration of sites to the CBA was proper and reasonable. *Matter of H & F Enter.*, B–251581.2, July 13, 1993, 93–2 C.P.D. ¶ 16, 1993 WL 274032 (C.G.).

In June 1993, and again in August 1995, an environmental assessment was conducted. Following additional consultations with Waco city officials and the VA, the CBA was redefined to avoid sites within the city's floodplain.

On August 10, 1995, GSA issued a solicitation for offers to construct and lease back a building where the successful bidder would purchase the property owned by the First Baptist Church, which is located within the CBA, construct a building and lease the space to GSA. In September 1995, H & F filed suit in this Court for declaratory and injunctive relief, alleging that GSA violated the Administrative Procedure Act ("APA").

## II. STANDARD OF REVIEW

### A. Motion for Summary Judgment

Summary judgment should be granted pursuant to Fed.R.Civ.P. 56 only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In ruling upon a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Bayer v. United States Dep't of Treasury*, 956 F.2d 330, 333 (D.C.Cir.1992). Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir.1975). The cross-motions for summary judgment pending before the Court present no genuinely disputed material facts that would preclude summary judgment.

### B. Review of Agency Action

■ The standard of review is whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (1989). This standard requires plaintiff to demonstrate that the agency action "had no rational basis" or "involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973).

■ The scope of review is narrow and the Court is expected to exercise restraint in deciding whether to set aside agency actions. *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 203–04 (D.C.Cir.1984); *Saratoga Dev. Corp. v. United States*, 777 F.Supp. 29, 39 (D.D.C.1991), *aff'd*, 21 F.3d 445 (D.C.Cir. 1994). If a rational basis exists for the agency's decision, the Court cannot substitute its judgment for that of the agency, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971), merely because the Court believes the procurement decision "ill-considered," *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1299–1301 (D.C.Cir.1971).

■ Moreover, the Court should not overturn agency decisions "on the ground that the procuring agency potentially or actu-

ally violated applicable law in some trivial way—the violation must have been *clear and prejudicial*." *Elcon Enter., Inc. v. WMATA,* 977 F.2d 1472, 1478 (D.C.Cir.1992) (citations omitted). The D.C. Circuit has held that:

> When a statute requires agencies to "consider" particular factors, "it imposes upon agencies duties that are essentially procedural.... [T]he only role for a court is to insure that the agency has considered the [factor]."

*Getty v. Federal Sav. and Loan Ins. Corp.,* 805 F.2d 1050, 1055 (D.C.Cir.1986) (quoting *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980)). *Accord City of Reading, Pa. v. Austin,* 816 F.Supp. 351, 359–61 (E.D.Pa.1993).

■ As a general rule, Courts should be reluctant to overturn agency actions validated on the merits by the GAO, which is "an arm of the legislature which is independent of the executive branch, and has an accumulated experience and expertise attested to by a substantial volume of bid protest cases filed and decided." *M. Steinthal,* 455 F.2d at 1305. *But cf. Latecoere Int'l, Inc. v. U.S. Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994) (uncritical deference to GAO decisions is not proper because it would, in effect, repeal Congress' grant of jurisdiction via APA).[3] In so defining the standard of review, the Court is not abdicating all of its powers of review, but rather recognizing the limits under which it operates and the deference due to those branches of the Government with the expertise and discretion to interpret and apply agency regulations. *Saratoga,* 777 F.Supp. at 37.

■ In applying the standard, review must focus on the administrative record before the agency at the time of its decision. *Overton Park,* 401 U.S. at 419–20, 91 S.Ct. at 825–26. The Court may consider background evidence outside of the administrative record only to clarify information before the

agency at the time of its decision. *Reading,* 816 F.Supp. at 361. The affidavits submitted by both sides should therefore be treated as mere background evidence to be used only to clarify the administrative record.

## III. DISCUSSION

### A. Standing

■ The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706, grants a right of judicial review to persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702 (1989). To have standing to obtain review of an agency action, plaintiff must allege injury in fact caused by arbitrary and capricious administrative action to an interest within the "zone of interests" protected by statute, executive order or regulation. *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 394–96, 107 S.Ct. 750, 754–55, 93 L.Ed.2d 757 (1987).

■ The seminal case of *Scanwell Labs., Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970), recognized that disappointed bidders are afforded standing under the APA to challenge agency actions. However, a standing inquiry is dependent on the factual background. *See Foundation on Economic Trends v. Lyng,* 943 F.2d 79, 82 (D.C.Cir.1991) (quoting *United States ex rel. Chapman v. FPC,* 345 U.S. 153, 156, 73 S.Ct. 609, 612, 97 L.Ed. 918 (1953) (Frankfurter, J.) (standing is "more or less determined by the specific circumstances of individual situations")).

■ While the present case arises out of the grant of a government contract through lease procurement competition, it is the atypical disappointed bidder action. Although plaintiff had the opportunity to bid for the lease construction of the chosen CBA site, it chose not to participate in the procurement competition. Nevertheless, plaintiff challenges not only the government's decision to

---

3. Citing *Delta Chem. Corp. v. West,* 33 F.3d 380, 382 (4th Cir.1994), plaintiff argues that the lack of consistency in GAO opinions renders them of little value and undeserving of judicial deference. However, the Fourth Circuit in Delta stated that "the lack of consistency *in the cited* GAO opin-ions, both internally and between opinions, renders them of little value and undeserving of judicial deference." *Id.* (emphasis added). The court was not making a comment on GAO opinions generally.

select a site from within the CBA, but also defendant's final site selection.

Defendant contends that any alleged injury is limited to GSA's decision to locate the VA regional office inside of the CBA, which was delineated by Waco city officials. Pursuant to defendant's theory, any further actions on the part of GSA in selecting a final site did not result in any injury to plaintiff. The Court is persuaded by defendant's argument and concludes that plaintiff only has standing to challenge the decision to select a site from within the CBA, and does not have standing to challenge the final site selection.

Having made that determination, the Court must determine exactly when the decision was made to select a site from within the CBA. Plaintiff argues that GSA made its decision to relocate the VA regional office in 1992, prior to complying with the E.O. mandate that adjacent areas and enumerated factors be considered.[4] However, the Court is not persuaded that the record shows that GSA made a final decision to relocate the VA facility to the CBA in 1992.

The affirmative indication from GSA that it had decided to select a site from within the CBA comes from an October 21, 1992 letter from Leonard Murphy, GSA Real Estate Division Director, to Lois High, the VA Regional Office Director. In the letter, Murphy indicated that the VA facility would be located on a site in the Waco CBA. However, on January 13, 1993, Earl Eschbacher, Jr., GSA Assistant Regional Administrator, wrote to H & F stating that no final decision had been made, that its facility had not been excluded from the bid process and that all previous correspondence suggesting otherwise should be disregarded. In a letter dated January

25, 1993, GSA informed the VA that it decided to select a CBA site for the new VA regional office. Plaintiff was notified of this decision on March 4, 1993. The Court is persuaded that the representations made in the January 13, 1993 letter from Eschbacher were accurate and concludes that the final decision to select a CBA cite was made on or about January 25, 1993.[5] The issue then becomes whether GSA complied with the E.O. to the extent required before making its decision to select a CBA site.

## B. Sufficiency of the Administrative Record

Before addressing plaintiff's claims that GSA's decision to select a site within the CBA was arbitrary and capricious for failure to comply with the Executive Order, the Court must first address plaintiff's claim that the administrative record is incomplete. Plaintiff contends that the administrative record fails to include relevant documents necessary for the Court to render a decision. The Court has thoroughly reviewed the record and has determined that the record is sufficient for the Court to render a decision on whether defendant's decision to select a site from within the CBA was arbitrary and capricious. The Court notes that documents referring to the final site are unnecessary because the propriety of the final site selection is not an issue before the Court. Likewise, GSA's dealings with other client agencies does not bear on whether GSA's decision to select a site from within the CBA in this case was arbitrary and capricious. In claiming that the record is incomplete, plaintiff provides a laundry list of alleged relevant documents missing from the administrative record. After reviewing the list and the

---

4. In support of its contention that the decision to select a CBA site was made in 1992, plaintiff initially placed heavy reliance on a letter dated April 2, 1992, from Margaret Mills, executive director of Downtown Waco, Inc., to Leonard Murphy, GSA Real Estate Division Director. This letter refers to the City's support for GSA's decision to move VA facility into the CBA. This letter also references Senator Bob Krueger and a letter he forwarded to Ms. Mills. Krueger, who had been the State Railroad Commissioner, was not appointed senator until *January 1993*, when Lloyd Bentsen left the Senate. The parties agree that this letter is clearly misdated.

5. The government claims that GSA *finalized* its decision to locate the VA regional office within the CBA in August 1995 when it issued solicitation for construction of the office space. The Court, nevertheless, finds that the decision to relocate to the CBA was made in January 1993. The January 25 and March 4, 1993 letters clearly states that the new site will be selected from within the CBA. Moreover, GAO entertained plaintiff's protest of the March 1993 decision over GSA's claim that the protest was premature. *Matter of H & F Enter.*, B–251581.2, July 13, 1993, 93–2 CPD ¶ 16, 1993 WL 274032 (C.G.).

record, the Court finds that the alleged missing documents are either non-existent or if in existence, were not relied upon by GSA in reaching its decision to locate the VA regional office within the CBA or are not necessary for the Court to reach a decision. *See James Madison Ltd. by Hecht v. Ludwig,* 82 F.3d 1085 (D.C.Cir.1996), *rh'g en banc denied,* (July 3, 1996). Having concluded that the administrative record is sufficient, the Court addresses the merits of this action.

**C. GSA's decision to select a site from within the CBA.**

When selecting a facility for a federal agency, GSA must comply with Executive Order No. 12072 and with its implementing regulations. E.O. 12072 expressly provides that:

Federal facilities and Federal use of space in urban areas shall serve to strengthen the Nation's cities and to make them attractive places to live and work. Such Federal space shall conserve existing urban resources and encourage the development and redevelopment of cities.

Executive Order No. 12072 § 1–101, 43 Fed. Reg. 36869 (August 16, 1978). The purpose of the E.O. was to strengthen the Nation's cities by encouraging the location of Federal facilities in the Nation's central cities. According to President Carter, this Order was intended "to move jobs and people and opportunities and growth down to the formerly abandoned central city areas of those that were being abandoned in a slow and inexorable way." 14 Wkly. Comp. Pres. Doc. 1427, 1428 (August 16, 1978).

The initial regulations promulgated pursuant to the E.O. provide that:

First consideration shall be given to a centralized business area and adjacent areas of similar character in the central city of Standard Metropolitan Statistical Areas (SMSA) defined by the Department of Commerce publication (Government Print-

ing Office Stock Number 041–001–00101–8), including other specific areas of a city recommended by the elected chief executive officer of the local government or a designees, except where this type of consideration is otherwise prohibited.

41 C.F.R. § 101–17.002(c)(1) (1987). In 1991, Temporary Regulation D–76 was promulgated which provided that:

In satisfying agency requirements in an urban area, GSA will review agency requested delineated areas to ensure that the areas are within the centralized community business areas (CBAs) and adjacent areas of similar character, including other specific areas which may be recommended by local officials in accordance with Executive Order 12072. When developing the requested delineated area, the client agency shall comply with the requirements of Executive Order 12072 which requires that first consideration be given to CBAs and other designated areas. If the delineated area requested is outside the CBA, in whole or part, the client agencies must provide GSA with adequate justification to support the delineated area. GSA will consult with local officials to identify CBAs. Each GSA regional office will provide, upon agency request, a description of the identified CBA for the community in which the agency requires space.

Temporary Regulation D–76, 41 C.F.R. § 101–17.205(f) (1991).[6]

The E.O. and implementing regulations mandate that when selecting a site for a federal facility, GSA must give first consideration to the CBA and adjacent areas of similar character. The E.O. also requires that the factors enumerated in the E.O. be considered by GSA when making a federal facility site selection.

In challenging GSA's decision to select a site from within the CBA, plaintiff first

6. FPMR Temp. Reg. D–76, which was promulgated in August 1991 and lapsed in November 1995, is applicable to the case at bar. While this temporary regulation was not in effect at the time of GSA's January 30, 1996 award of the contract, it was in effect when GSA made its decision to relocate the VA regional office to a site within the CBA in early 1993. It was also in effect when GSA accepted Waco city official's final delineation of the CBA in November 1994 and when GSA finalized its decision to locate the VA regional office within the CBA in August 1995.

maintains that the CBA was improperly delineated. In this regard, plaintiff suggests that improper political influence of Waco city officials and others determined the definition of the CBA. However, other than mere speculations, plaintiff has failed to demonstrate any improper conduct on the part of the Waco city officials or others with regard to the CBA definition. In accordance with the E.O. and the regulations, GSA consulted with local officials on the delineation of the CBA. The city of Waco proposed the CBA, and GSA accepted it. Contrary to plaintiff's suggestion, the redefinition of the CBA to avoid areas in the flood plains does not establish improper delineation on the part of the city. This demonstrates, at least ultimately, conscientious consideration of the CBA area. Not only has plaintiff failed to show improper conduct with regard to the delineation of the CBA, plaintiff has also failed to demonstrate that GSA's acceptance of the CBA was arbitrary and capricious.

Plaintiff also claims that GSA misinterpreted the E.O. by concluding that it required the new site to be selected only from within the CBA. The Court is not persuaded by plaintiff's claim that the record demonstrates that GSA interpreted the E.O. as requiring the selection of a CBA site *exclusively.* While there are documents in the record which convey GSA's view that a CBA site was highly preferable, those documents also indicate the possibility of a non-CBA site selection where the necessary justification has been made. Moreover, there is ample evidence in the record which demonstrates GSA's actual consideration of non-CBA areas.

▮▮▮ Plaintiff also argues that its facility is located in an adjacent area of similar char-

acter to the CBA and it, therefore, should have received first consideration. The record before the Court does not support such a finding. In a letter to GSA dated April 16, 1992, and in H & F's Site Evaluation and Selection Process Report, dated July 28, 1993, J.C. Snead, H & F's Managing Director, stated that the H & F site is located in a "suburban" area. Such a characterization of the H & F location by plaintiff's managing director forecloses any compelling argument that H & F is located in an adjacent area *of similar character* to the CBA, where the CBA by definition is an "urban" area. Thus, the Court concludes that plaintiff's facility was not entitled to first consideration as a facility located in an adjacent area of similar character.

Plaintiff also argues that GSA failed to comply with the E.O. in selecting the VA regional office location. Plaintiff claims that the administrative record does not reflect consideration of the factors which the E.O. requires to be considered during a site selection process. The Court again notes that the propriety of the final site selection is not the issue before the Court. What is before the Court is GSA's decision to select a site from within the CBA. Because the Court is reviewing a decision made during the early stage of the site selection process, it is not necessary for GSA to establish that every factor enumerated in the E.O. was considered prior to the decision at issue. The Court concludes that only the factors relevant to a decision to select a site from within the CBA must be shown to have been considered by GSA.[7]

Clearly relevant to the decision to select a site from within the CBA exclusively, and required by the E.O. and regulations is

---

7. Plaintiff dedicates much of its argument to claiming that GSA failed to consider factors set forth in sections 1–104, 1–105, 1–201, and 1–203 of the E.O. However, many of the factors enumerated in those sections, particularly sections 1–104 and 1–105, need only be considered during the latter stages of the site selection process. Indeed, subsections 1–104(a), (b), (c) and 1–105(e) are clearly factors to be considered during the final stages of the site selection process. Moreover, subsections 1–105(a) and (c) factors should apply only to the site selection process within the CBA *during* GSA's first consideration.

The policies of the E.O. make the preservation and revitalization of cities of primary importance by articulating that CBAs be given first consideration. It follows, therefore, that subsections 1–105(a) and (c) must be considered within the context of the first consideration accorded CBAs. If all possible sites and existing buildings are given first consideration, the delineation of a CBA becomes meaningless. The factors stated in E.O. 12072 must be addressed in light of the "first consideration" provided CBAs. "First consideration means first consideration." *Reading,* 816 F.Supp. at 362.

GSA's consideration of the local VA officials' positions. Plaintiff claims that GSA failed to consider the position of VA officials. However, the record shows otherwise.

As early as 1991, GSA began discussion with the Waco VA office regarding continuing space requirements and possible new locations. In January 1992, the VA Regional Office Director, Alonzo Poteet, expressed a desire to have the new location for the VA office to be in downtown Waco. In October 1992, new VA Regional Office Director, Lois High, expressed a desire to have a delineated area which included non-CBA locations. In a December 21, 1992 letter, GSA informed the VA that the delineated area it requested was not in accordance with E.O. 12072 and the regulations, and that the VA should provide a strong "mission-related" justification for its request. In its response to GSA's request, the VA informed GSA of concerns that should be considered in selecting a site, but at no point did the VA indicate a preference regarding a location inside or outside of the CBA, or provide any justification for delineating an area other than the CBA. Thus, contrary to plaintiff's claim, there is ample evidence of discussions between GSA and the VA, and GSA's consideration of VA's position.

Plaintiff also argues that GSA required the VA officials to do more than "adequately justify" its desire to have a delineated area which included non-CBA locations. Temporary Regulation D–76 requires that an "adequate justification" be provided where the agency requests a delineated area larger than the CBA for selecting an agency location. GSA interpreted the language, "adequate justification," as requiring a strong "mission-related" justification. GSA's interpretation of its own regulations must be given deference and will be reviewed only to determine if the interpretation is plainly erroneous or inconsistent with the regulation. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965). GSA's interpretation cannot be said to be without a rational basis or to be a clear and prejudicial violation of the applicable statute or regulations.

Also relevant to the decision to select a CBA site is the E.O. requirement that GSA ensure that "space requirements are met in a manner that is economically feasible and prudent." During the course of its site selection process, GSA conducted a market survey, a rent survey and two environmental assessments. Prior to making the decision to relocate the VA regional office to a site located within the CBA, GSA's market survey revealed that plaintiff's facility would require extensive and expensive renovations to meet not only VA's space requirement, but also to bring the space up to current health, fire and safety standards. Contrary to plaintiff's assertion, nothing about the various studies suggests that they were perfunctory. The Court concludes, after a thorough review of the record, that GSA complied with E.O. 12072 to the extent required before deciding to select a site from within the CBA exclusively.

## IV. CONCLUSION

Defendant's motion for summary judgment is **GRANTED**. Plaintiff's motion for summary judgment is **DENIED**. An Order will issue with this Opinion.