**CITY OF READING, PENNSYLVANIA**

v.

**Richard G. AUSTIN, Administrator of the General Services Administration and Hough/Loew Associates, Inc., Intervenor.**

Civ. A. No. 92–4885.

United States District Court,
E.D. Pennsylvania.

March 17, 1993.

Susan B. Cassidy, Washington, DC, and Joseph E. Wolfson, Reading, PA, for plaintiff.

David F. McComb, Asst. U.S. Atty., Philadelphia, PA, for defendant.

Jack Thomas Tomarchio, Philadelphia, PA, for intervenor.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

## I. INTRODUCTION

The plaintiff, City of Reading ("Reading"), Pennsylvania, seeks judicial review of the decision of the defendant, Richard G. Austin, Administrator of the General Services Administration ("GSA"), to relocate five federal agencies from the central business area of Reading to the Boroughs of West Reading and Wyomissing, which are suburbs of Reading. Reading contends that GSA violated Presidential Executive Order 12072, 43 Fed. Reg. 36,869 (1978), *reprinted in* 40 U.S.C.App. § 490 note, as well as its own implementing regulations by failing to give "first consideration" to the central business areas of Reading as the site for relocation.

This action was originally brought in the United States District Court for the District of Columbia. On July 31, 1992, the case was transferred to us for the convenience of the parties and witnesses, and in the interest of justice pursuant to 28 U.S.C. § 1404(a).

With the consent of the parties, the present lessor of the five agencies, Hough/Loew Associates, Inc.'s, Motion to Intervene was granted on September 24, 1992.

Before the Court are GSA's and Hough/Loew's Motion to Dismiss or, in the alternative, Motion for Summary Judgment, and Reading's Cross–Motion for Summary Judgment. For the reasons stated in this Opinion, Reading's Motion for Summary Judgment is granted in part and denied in part, and the Motions of GSA and Hough/Loew are denied.

## II. FACTUAL BACKGROUND

As discussed later in part IV, section B of this Opinion, the focal point for our review is the Administrative Record. In December of 1990, along with the United States Bankruptcy Court and Probation Office, five federal agencies were located in leased space in the East Shore Office Building located at 45 South Front Street, Reading, Pennsylvania: 1) the Social Security Administration ("SSA"); 2) the Bureau of Alcohol, Tobacco, and Firearms ("BATF"); 3) the Defense Contract Management Area Office ("DCMAO"); 4) the Internal Revenue Service ("IRS"); and 5) the Department of Labor, Wage and Hour Division and its Bureau of Apprenticeship and Training. This building was owned by the Reading Area Community College ("RACC") and was located in Reading's central business area. The agencies had been in this location for approximately fifteen years.

RACC wanted more space to accommodate its growing student body and on February 15, 1991, representatives of Reading, RACC, and GSA met to discuss how GSA could accommodate RACC's need to expand into space leased to five of the federal agencies (SSA, BATF, DCMAO, the IRS, and the Department of Labor). Administrative Record, No. 7. GSA had lease rights to occupancy, on behalf of its client agencies, for another five years at a very favorable rental rate. Administrative Record, Nos. 18, 19. GSA took the position that its duty to the public prohibited terminating the lease merely because RACC had found a more favorable use

for the space. However, to assist RACC in its expansion effort, GSA agreed to relocate the agencies within the central business area of Reading if space could be provided at no cost to the government. Administrative Record, Nos. 18, 19.

The Regional Administrator of GSA, George P. Cordes, explained that if GSA was required to use a formal procurement process, suburban locations might be considered as possible relocation sites. However, in explaining GSA's locational policy, he indicated that the client agencies would be required to justify their move to a suburban location and that Reading would have an opportunity to respond to these justifications before a decision was reached to relocate outside of Reading. See Administrative Record, Nos. 18, 20.

On March 25, 1991, Meridian Properties, a local real estate broker, submitted three proposals to RACC for office space. Administrative Record, No. 20. All three buildings— the American House at 4th and Penn Street, the Madison at 400 Washington Street, and the former Aetna Building at 6th and Court Streets—are located within Reading's central business area. *Id.* The rental rate for the American was $11.90 per square foot and the Madison was $10.00 per square foot. These rates included standard improvements, all utilities, maintenance, and janitorial services. The former Aetna Building was available for sale and, possibly, for lease.

On May 16, 1991, GSA again met with RACC and City officials to discuss the proposals for the three buildings. Administrative Record, No. 11. At this meeting, Mr. Cordes informed Reading that the proposed rates were too high. See Administrative Record, Nos. 11, 20. On July 22, 1991, RACC informed Mr. Cordes at GSA that the Madison Building was now available at a reduced price of $9.25 per square foot with a $.50 per square foot increase in each subsequent year of the lease. Administrative Rec-

ord, No. 9. GSA also rejected this revised proposal.

GSA had determined that Meridian Properties' proposals did not satisfy its position concerning relocation at no cost to the taxpayer. The proposals were unacceptable because the new rental rates were significantly higher than the rates in its current lease with RACC, included no relocation costs, and covered only a part of the requisite alteration costs. Administrative Record, No. 11. Additionally, in July of 1991, GSA had ascertained that the United States Bankruptcy Court for the Eastern District of Pennsylvania would be expanding into a portion of the Madison Building office space included in the proposal. Administrative Record, No. 21. Thus, GSA determined that the Madison Building was no longer available as a possible site for relocation. Administrative Record, No. 11.

During various periods in 1990 and 1991, GSA conducted a review of the requirements for each of the five agencies which would be affected by the relocation. Administrative Record, Nos. 1–6. In these reviews, each of the agencies identified its space requirements and indicated a delineated geographical area within which the agencies desired to locate. Administrative Record, Nos. 1–6. In March of 1990, the Department of Labor expressed a preference for locating both its Wage and Hour Division and Bureau of Apprenticeship and Training in the central business district of Reading. Administrative Record, No. 2.

In June of 1990, SSA indicated a desire to locate northwest of Reading's central business area, near the major traffic arteries: Route 422, the Warren Street Bypass, or the West Shore Bypass. Administrative Record, No. 3. However, SSA's recommendation for a geographical area to relocate included Reading's central business area. *Id.* SSA justified[1] its recommendation to GSA by stating that:

---

1. During a requirements review, four years earlier, in 1986, SSA also provided justifications to GSA for its desire to relocate near the major arteries. Administrative Record, No. 3. SSA's justifications were based on a population shift from Reading to the area west of Reading, which was documented during the 1970 and 1980 censuses, and its determination that the central busi-

ness area of Reading was too congested due to the factory outlets attracting many tourists. *Id.* SSA concluded that a location near the major arteries would be near the population and geographic centers of its service area. *Id.* Additionally, in choosing this location, SSA considered the availability of public transportation. *Id.* Local bus service ran along Route 222 (Fifth

the majority of its service area population resides in an area encompassed by Muhlenberg, Spring, Cumru, and Exeter townships. A survey of visitors indicates that 75% arrive by car, with the remaining visitors relying on public transportation or walking to the office.

. . . .

[Thus,] [a]ccess to ample parking and public transit is critical to enable us to provide service to the public.

*Id.* In February of 1992, SSA revised its recommendation to GSA by eliminating the downtown area from its delineated area. Administrative Record, No. 16. SSA provided the same justifications but, additionally, concluded that relocation was necessary because Reading did not have adequate parking for its claimants. *Id.*

In April of 1991, BATF expressed a general geographical preference to relocate to an area northwest of Reading, which included a portion of Reading's central business area. Administrative Record, No. 4. The Administrative Record does not reveal that BATF provided any justifications to GSA for its recommendation.

In the April of 1990, DCMAO indicated a geographical preference for the Wyomissing area, but also asked GSA, in June of 1990, to consider rehabilitation of its current location before changing its location. Administrative Record, Nos. 5, 15. The Administrative Record does not indicate that DCMAO provided any justifications to GSA for its recommendations at this point. In a letter to GSA, dated January 10, 1992, DCMAO expressed its desire to remain at the RACC Building, but if relocation was necessary, DCMAO firmly objected to relocation deeper within Reading and again indicated a preference for the Wyomissing area. Administrative Record, No. 15. The letter also provided a thorough explanation in support of DCMAO's preference, based on its mission, employee safety, and associated support functions and activities. *Id.*

In June of 1990, the IRS indicated a geographical preference to relocate to the West Reading/Wyomissing area. Administrative Record, No. 6. The IRS justified its recommendation to GSA by stating its intent in choosing this area was:

to provide a quality working environment that is convenient, pleasant and functional for both our employees and our taxpayer customers. We have found the current location and facilities not to be in accord with these desires and we therefore are interested in locating our office to an area that is more in tune with our agency mission.

*Id.*

By the end of August of 1991, GSA had reached a final decision to relocate the five agencies outside of Reading's central business area, to the West Reading/Wyomissing Boroughs and initiated the formal procurement process to seek space in this area. In a letter, dated July 15, 1991, GSA informed RACC and Reading that the majority of the agencies had determined that if relocation was necessary, their missions could best be performed from a locational base in the West Reading/Wyomissing area. Administrative Record, No. 8. GSA's purpose for this correspondence was to seek consideration from RACC, after the plan for a no-cost move had failed, for ceding its rights under the lease for the remaining five-year period. *Id.*

On August 1, 1991, GSA placed an advertisement in the Reading Eagle Times newspaper requesting listings for 30,000 net usable square feet of space in the West Reading/Wyomissing area. Administrative Record, No 10. On August 28, 1991, GSA issued Solicitation No. MPA 91194 to lease 30,000 net usable square feet of office space in West Reading/Wyomissing, Pennsylvania. Administrative Record, No. 12. The location sought in the Solicitation is summarized as "outside City Center." *Id.* at ¶ 1.3. There is no evidence in the Administrative Record that Reading was either informed about, or provided a copy of the Solicitation beyond the notice provided to the general public.

---

Street) to the north of Reading and along Penn Avenue and Bern Road to the west of Reading. Also, SSA considered that availability of public parking was essential as most of its claimants travel by private automobile. *Id.*

**356**

On September 25, 1991, GSA conducted a market survey of available office space in Wyomissing, Pennsylvania. Administrative Record, No. 13. On March 11, 1992, GSA entered into a lease with Hough/Loew Associates, Inc., for 30,000 net usable square feet of office space on the first floor of Berkshire Knoll, located at 1125 Berkshire Boulevard in Wyomissing, Pennsylvania. Administrative Record, No. 17. The Administrative Record does not indicate that GSA notified Reading directly that it had signed a lease with Hough/Loew.

On May 15, 1992, two months after GSA has entered into the new lease, Reading received, for the first time, written justifications from GSA in support of the geographical preferences of SSA, DCMAO, and the IRS. *See* Administrative Record, No. 20. The City forwarded its rebuttal to these justifications to GSA on June 1, 1992. Administrative Record, No. 20. Reading did not receive any justifications from the Department of Labor and BATF.

Beginning in 1991 through the summer of 1992, Reading sought the assistance of its elected representatives: U.S. Senator Arlen Specter, U.S. Senator Harris Wofford, and U.S. Representative Gus Yatron, to encourage GSA to give the central business area of Reading preference in the relocation of the five agencies from RACC. *See* Administrative Record, Nos. 7, 11, 18, and 19. GSA had knowledge that Reading was seeking to resolve this issue through these channels. *See* Administrative Record, Nos. 7, 11, 18, and 19.

In July of 1992, the five agencies: the Department of Labor, Wage and Hour Division and its Bureau of Apprenticeship and Training; SSA; BATF; DCMAO; and the IRS; moved their offices from the East Shore Office Building at RACC to Wyomissing, Pennsylvania. *See* Administrative Record, No. 18. Meanwhile, unable to resolve the dispute, Reading filed the instant action on July 9, 1992, seeking to require GSA to conduct a procurement that gives "first consideration" to Reading's central business district as the area for relocating the five federal agencies.

## III. STANDARD OF REVIEW

The standard of review pertaining to summary judgment is well known. Summary Judgment shall be granted "if ... there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of identifying for the court those portions of the record that it believes demonstrate the absence of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). This burden may be discharged by demonstrating that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S.Ct. at 2554. Where the non-moving party has the burden of proof at trial on an issue for which summary judgment is sought, that party must then make a showing sufficient to establish the existence of the essential elements of her case in order to survive a summary judgment motion. *Id.* at 322–23, 106 S.Ct. at 2552. In making such a determination, the appropriate inquiry is whether there is a need for a trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Where the full record, taken together could not lead a rational trier of fact to find for the non-moving party, no genuine issue exists for trial." *United States v. One 107.9 Acre Parcel of Land,* 898 F.2d 396, 398 (3d Cir.1990) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)).

In applying the standard for summary judgment, our analysis is guided by the following well established rules. All inferences must be drawn in favor of the non-moving party, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Continental Ins. Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982), all doubts must be resolved against the moving party, *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.) (citations omitted), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985), and all allegations of the non-moving party that conflict with those of the movant must be taken as true. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at

2513. However, "the mere existence of some allegedly factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48, 106 S.Ct. at 2510. If the evidence is merely "colorable" or "not significantly probative", summary judgment may be granted. *Id.* at 249, 106 S.Ct. at 2511. A party resisting a summary judgment motion "cannot ... rely merely upon bare assertions, conclusory allegations or suspicions." *Ness v. Marshall,* 660 F.2d 517, 519 (3d Cir.1981); Fed.R.Civ.P. 56(e). A " 'response must set forth specific facts showing that there is a genuine issue for trial.' " *Gans v. Mundy,* 762 F.2d at 341 (quoting Fed.R.Civ.P. 56(e)).

## IV. DISCUSSION

### A. THRESHOLD ISSUES

GSA has initially presented a number of procedural arguments concerning this Court's jurisdiction and ability to hear this action. First, GSA contends that this action is not subject to judicial review because the decision to relocate the agencies outside Reading's central business area was committed to its discretion by law under 5 U.S.C. § 701(a)(2). Second, GSA argues that no private cause of action is available to Reading.

■ Reading brought suit against the Administrator of GSA, the head of a federal agency, "to compel agency action unlawfully withheld," 5 U.S.C. § 706(1), or alternatively, to "hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). In such a case, a right of action is expressly created by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706, which states that " 'final agency action for which there is no other adequate remedy in a court [is] subject to judicial review,' [5 U.S.C. § 704],

at the behest of '[a] person ... adversely affected or aggrieved by agency action.' [5 U.S.C. § 702]." *Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. 221, 231 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986).

Reading's action is subject to judicial review under 5 U.S.C. § 704. First, GSA's actions constitute the action of an agency. 5 U.S.C. § 701(b)(1); *see also Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). Second, there has been "final agency action" in that GSA contends that the central business area of Reading received all the consideration that it was due; the procurement process has reached a conclusion; and the agencies have relocated outside of Reading to Wyomissing, Pennsylvania. 5 U.S.C. § 701(b)(2); *see also Franklin v. Massachusetts,* 505 U.S. ——, ——, 112 S.Ct. 2767, 2773, 120 L.Ed.2d 636 (1992). Finally, this is an action "for which there is no other adequate remedy[2] in a court" as the issue of whether GSA gave Reading's central business area the requisite "first consideration" will not otherwise arise in litigation. *Cf. Bowen v. Massachusetts,* 487 U.S. 879, 901–05, 108 S.Ct. 2722, 2736–38, 101 L.Ed.2d 749 (1988) (The U.S. Claims Court, which has jurisdiction to hear certain claims against the United States, 28 U.S.C. § 1491, is not an adequate substitute for review in the District Court under the APA.).

Reading is sufficiently "aggrieved" by GSA's alleged failure to give "first consideration" to Reading's central business area within the meaning of Executive Order 12072, 43 Fed.Reg. 36,869 (1978), *reprinted in* 40 U.S.C.App. § 490 note [hereinafter Executive Order 12072], to be entitled to judicial review under 5 U.S.C. § 702. Section 702 grants standing to a plaintiff "adversely affected or aggrieved," i.e. injured in fact, by agency action, and whose injury is also within the "zone of interests" protected by a statute, executive order, or regulation that the agen-

---

**2.** The primary thrust of section 704 is to codify the exhaustion of administrative remedies requirement. *Bowen v. Massachusetts,* 487 U.S. 879, 902–03, 108 S.Ct. 2722, 2736, 101 L.Ed.2d 749 (1988). Neither GSA, nor the Intervenor, Hough/Loew Associates, Inc., has argued that

this requirement bars Reading's action. However, we note that the jurisdiction of the Comptroller General to hear protests in procurement disputes is nonexclusive and does not affect a party's right to bring an action in United States District Court. 31 U.S.C. § 3556.

cy is alleged to have violated. *Clarke v. Securities Industry Assn,* 479 U.S. 388, 394–96, 107 S.Ct. 750, 754–55, 93 L.Ed.2d 757 (1987).

An economic study estimates that due to the relocation of the five agencies and approximately 178 to 240 federal jobs, Reading will lose, over the 10–year lease period, $2.3 to $3.0 million in retail sales, $403,057 in property taxes, and $1.1 to $1.5 million in parking revenues. Plaintiff's Brief, Appendix B. This potential harm is more than sufficient to satisfy the injury in fact prong of the standing analysis. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 686–88, 93 S.Ct. 2405, 2415–16, 37 L.Ed.2d 254 (1973).

In addition, injury in fact is not just limited to economic injury. *Id.* at 686, 93 S.Ct. at 2415. Here, the relocation of the agencies may inflict upon Reading exactly the type of injury that the Executive Order sought to prevent by weakening Reading and discouraging its development and redevelopment. Executive Order 12072 § 1–101. Thus, Reading's injury is also within the zone of interests protected by the Executive Order. *See Clarke v. Securities Industry Ass'n,* 479 U.S. at 399–403, 107 S.Ct. at 757–59. Accordingly, Reading has standing to challenge GSA's alleged failure to give Reading's central business area "first consideration" under the APA.[3]

Once the above requirements are satisfied, the Supreme Court has affirmatively held that a "separate indication of congressional intent to make agency action reviewable under the APA is not necessary; instead, the

rule is that the cause of action for review of such action is available absent some clear and convincing evidence of legislative intention to preclude review." *Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. at 231 n. 4, 106 S.Ct. at 2866 n. 4 (citations omitted). The two exceptions to this general rule of reviewability are 1) where "statutes preclude judicial review," and 2) where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). We are unaware of any statutes precluding judicial review and GSA claims that its action in this case falls within the latter of these two exceptions.

■ There is a strong presumption of reviewability of agency action under 5 U.S.C. § 701(a)(2). *Davis Enter. v. United States Envtl. Protection Agency,* 877 F.2d 1181, 1184–85 (3d Cir.1989) (citation omitted), *cert. denied,* 493 U.S. 1070, 110 S.Ct. 1113, 107 L.Ed.2d 1020 (1990). The Supreme Court first discussed section 701(a)(2) in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Court noted that this provision is a narrow exception that is applicable only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Id.* at 410, 91 S.Ct. at 820–21 (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)). In *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985), the Court reaffirmed its interpretation of section 701(a)(2) by stating that the exception applies where "the statute is drawn so that a court would have no meaningful standard against which

---

**3.** We note that the Third Circuit has recognized that the APA affords a basis for judicial review of GSA leasing decisions by an unsuccessful bidder. *Merriam v. Kunzig,* 476 F.2d 1233, 1240 (3d Cir.), *cert. denied,* 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973). In *Merriam,* the court adopted the holding of *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970), the seminal case on the issue of an unsuccessful bidder's standing under the APA. *Merriam v. Kunzig,* 476 F.2d at 1240. In *Scanwell,* the District of Columbia Circuit established that:

> The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a

suit brought by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a "private attorney general."

*Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d at 864. Thus, the Third Circuit found that an unsuccessful bidder, in pursuit of the vindication of his injury, may not only assert his own rights, but also those of the public. *Merriam v. Kunzig,* 476 F.2d at 1240. We, similarly, find that Reading may assert both its own economic interest as well as the public's interest in strengthening our Nation's cities and in making them attractive places to live and work. See Executive Order 12072 § 1–101.

to judge the agency's exercise of discretion." [4]

The Third Circuit has prescribed three criteria to be considered in determining whether an agency decision is unreviewable under section 701(a)(2). *Davis Enter. v. United States Envtl. Protection Agency*, 877 F.2d at 1185 (citing *Local 2855, AFGE (AFL–CIO) v. United States*, 602 F.2d 574, 578–80 (3d Cir.1979)). To find a decision unreviewable, a court must consider whether:

1) the action involves broad discretion, not just the limited discretion inherent in every agency action . . .; 2) the action is the product of political, military, economic, or managerial choices that are not readily subject to judicial review . . .; and 3) the action does not involve charges that the agency lacked jurisdiction, that the decision was motivated by impermissible influences . . ., or that the decision violates a constitutional, statutory, or regulatory command.

*Id.* (citations omitted).

GSA contends that language in Executive Order 12072 and its own implementing regulations is drawn in such broad terms that there is "no law to apply." Executive Order 12072 was promulgated pursuant to a delegation of authority from Congress in 40 U.S.C. § 486(a) and, therefore, has the force and effect of law. *Farmer v. Philadelphia Elec. Co.*, 329 F.2d 3, 7 (3d Cir.1964). The Executive Order provides a number of factors, which are relevant to this case, that must be considered in the process of meeting federal space needs in urban areas. The primary factors at issue in this case are found in three main places of the Executive Order. Section 1–103 of the Order provides, in relevant part, that "the process for meeting Federal space needs in urban areas *shall give* first consideration to a centralized community business area and adjacent areas of similar character, including other specific areas which may be recommended by local officials." Executive Order 12072 § 1–103 (emphasis added). In implementing the policies of this Order, GSA

must "[c]onsider the efficient performance of the missions and programs of the agencies, the nature and function of the facilities involved, the convenience of the public served, and the maintenance and improvement of safe and healthful working conditions for employees." *Id.* at § 1–203(a). Additionally, GSA must "[c]onsult with appropriate Federal, State, regional, and local government officials and consider their recommendations for and objections to a proposed selection site or space acquisition." *Id.* at § 1–203(c).

■ We believe that the above provisions of the Order are sufficient to make agency actions reviewable from a procedural standpoint. *Cf. Jane D. v. Social Security Admin.*, No. 87–1867, 1987 WL 25625, at *1 (E.D.La. Nov. 30, 1987) (finding no clear and convincing evidence of Congressional intent to preclude review of agency decisions allegedly violating Executive Order 12072). When an agency is required by law to "consider" a particular factor, the duties placed upon an agency are essentially procedural and, thus, a court's review is limited to ensuring that the agency has considered the factor. *Getty v. Federal Sav. and Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C.Cir.1986) (citing *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980)). The Third Circuit has also found that agency action is reviewable when an agency is required to consider certain factors in reaching a decision. *Davis Enter. v. United States Envtl. Protection Agency*, 877 F.2d at 1186; *see also Chong v. Director, United States Info. Agency*, 821 F.2d 171, 175–76 (3d Cir. 1987). In short, when the legislature or Executive is not indifferent to the factors an agency must consider in reaching a decision, within the confines of the authority delegated to it, and does not preclude judicial review, then we must presume that "the legislature [or Executive] expected the courts to review [the agency action] with a degree of scrutiny calibrated to the issues involved." *National*

---

**4.** The Third Circuit has found that *Heckler v. Chaney* did not change the presumption of reviewability of agency action under the APA. *Davis Enter. v. United States Envtl. Protection*

*Agency*, 877 F.2d 1181, 1185 (3d Cir.1989) (citation omitted), *cert. denied*, 493 U.S. 1070, 110 S.Ct. 1113, 107 L.Ed.2d 1020 (1990).

*Treasury Employees Union v. Horner,* 854 F.2d 490, 495. (D.C.Cir.1988).

In addition to challenging GSA's alleged procedural failures, Reading apparently also attacks the very substance of GSA's decision to relocate the agencies outside of Reading's central business area. Plaintiff's Brief, section I(B)(3). As we noted above, our review is limited to ensuring compliance with the Executive Order's procedural requirements. Once we have found that GSA complied with the applicable procedural requirements, our inquiry is complete. A court cannot interject itself within an area of GSA's discretion as to the choice of action to be taken. *Cf. Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980) (citations omitted). Applying the first criterion of the Third Circuit's three prong test in *Davis Enter. v. United States Envtl. Protection Agency,* Executive Order 12072 mandates that numerous factors must be considered in the process of meeting federal space needs, but provides no meaningful benchmarks for a court to effectively evaluate GSA's ultimate decision in meeting those needs. Further, with respect to the second criterion in *Davis Enter. v. United States Envtl. Protection Agency,* we find that leasing decisions as to site selection and space acquisition involve managerial and economic choices dependent on GSA's special expertise in this area and are, therefore, not readily subject to judicial review. *Cf. Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1271 (5th Cir.1978) (judges are ill-equipped to settle the delicate questions involved in procurement decisions) (citations omitted). Accordingly, our review is not designed to review the merits of GSA's decision, but to ensure a fully informed and well-considered decision.[5] *Cf. Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. at 227, 100 S.Ct. at 500 (citation omitted).

Finally, Reading contends that GSA violated its own regulations both by failing to

require the agencies to justify their requested delineated areas and by failing to review such justifications before making its decision to relocate outside Reading's central business area. Pointing to the language in 41 C.F.R. § 101–17.205(f) (1992), GSA argues that its regulations, implementing Executive Order 12072, provide no meaningful standards against which to judge its actions. In giving "first consideration" to central business areas, GSA does appear to have broad, unbridled discretion under the Executive Order to require any information from an agency that it *deems necessary to carry out its function.* Executive Order 12072 § 1–202; *cf. Kirby v. United States Gov't, Dep't of Hous. and Urban Dev.,* 675 F.2d 60, 68 (3d Cir.1982). Thus, the issue of whether or not GSA failed to require the five agencies to submit justifications for its review under the Executive Order may not by itself be reviewable by us. However, judicial review is foreclosed only " 'to the extent that agency action is committed to agency discretion by law.' " *Local 2855, AFGE (AFL–CIO) v. United States,* 602 F.2d 574, 580 (3d Cir.1979) (quoting 5 U.S.C. § 701(a)(2)). Therefore, the Third Circuit's third criterion permits us to still entertain claims that GSA violated a "constitutional, statutory, or regulatory command." *Kirby v. United States Gov't, Dep't of Hous. and Urban Dev.,* 675 F.2d at 67 (citing *Local 2855, AFGE (AFL–CIO) v. United States,* 602 F.2d at 580).

Furthermore, GSA's current Federal Property Management Regulations, which implement Executive Order 12072, and command GSA to review agency compliance, provide, in relevant part, that:

[w]hen developing the requested delineated area, the client agency shall comply with the requirements of Executive Order 12072 which requires that first consideration be given to [central business areas] and other designated areas. If the delineated area requested is outside the [cen-

---

**5.** In *Alexander v. Carmen,* No. 81–835, slip op. at 9 (W.D.Pa. Nov. 5, 1981), the court held that Executive Order 12072 did *not* contain sufficient law to apply to make GSA's action reviewable. The court reasoned that although the Executive Order provides criteria that must be considered when making a decision concerning space acqui-

sition, the Order does not provide any fixed standards that would permit review of the substantive merits of the decision. *Id.* While we agree with the reasoning in *Alexander,* we are not persuaded by the court's implicit conclusion that even the procedural requirements articulated in the Executive Order are unreviewable.

tral business area], in whole or part, the client agencies must provide GSA with adequate justification to support the delineated area.

41 C.F.R. § 101–17.205(f) (1992). Since GSA has specified that an agency must submit justifications for its review in order to support a proposed geographical preference, it has effectively limited its own discretion and would not be free to make a decision to relocate an agency outside of a central business area without first requiring the agency to justify its preference and reviewing such justifications. *See Davis Enter. v. United States Envtl. Protection Agency*, 877 F.2d at 1186 (citing *Service v. Dulles*, 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957)). We find, therefore, that 41 C.F.R. § 101–17.205(f) (1992) provides additional guidance and support for our review.[6]

Accordingly, Reading is entitled to pursue its claims for nonmonetary relief under the right of action created by the APA. Based on the right to judicial review under the APA, we have jurisdiction to review GSA's action pursuant to 28 U.S.C. § 1331. *Hondros v. United States Civil Serv. Comm'n*, 720 F.2d 278, 291 n. 31 (3d Cir.1983) (citing *Jaffee v. United States*, 592 F.2d 712, 718–19 (3d Cir.), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979)); *Robbins v. Reagan*, 780 F.2d 37, 42 (D.C.Cir.1985) (citing *Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977)). Having addressed the initial jurisdictional arguments, we now turn to review GSA's actions under the APA.

## B. STANDARD OF REVIEW UNDER THE APA

The APA provides that a reviewing court shall "hold unlawful and set aside agency action ... found to be ... arbitrary, capri-

cious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The Supreme Court has stated that to make this finding a court must consider "whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) (citations omitted). Our inquiry must be "searching and careful" to determine if GSA actually considered the relevant factors. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

In applying this standard, we are required to base our review on the full administrative record that was before the agency at the time of its decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 420, 91 S.Ct. at 825. Thus, the focal point of our review is the record that was compiled in the course of the informal agency action and presented to the court. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985) (citations omitted). One exception to the general rule permits a court to go outside of the record to consider background evidence clarifying the information before the agency at the time of its decision. *Public Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982); *see also Armstead v. United States Dep't of Hous. and Urban Dev.*, 815 F.2d 278, 281 (3d Cir.1987). Accordingly, although Reading has submitted extensive exhibits in support of its Brief, in the context of our review of GSA's decision, we must limit our consideration of these exhibits to background evidence that clarified some of the information before GSA at the time of its decision.[7]

---

**6.** We note that 41 C.F.R. § 101–17.205(f) (1992) requires agencies to submit *adequate* justifications. However, based on our foregoing analysis as to the substance of GSA's decision to relocate the agencies outside of Reading's central business area, the justifications are not reviewable for either the adequacy of their detail, or their persuasiveness.

**7.** As we discuss later in part IV, section D of this Opinion, the rule confining review to the admin-

istrative record before the agency is limited to the review of the agency's actions and does not apply to evidence concerning a court's later consideration of the appropriateness of an equitable remedy for unlawful agency action or defenses thereto. In these circumstances, there is no danger of substituting a court's judgment for that of the agency because an agency would not entertain such matters. Moreover, in this context, the administrative record would not contain all the

## C. AGENCY ACTION

The Federal Property and Administrative Services Act, 40 U.S.C. §§ 471–544, authorizes GSA to enter into leasing agreements to meet federal space needs. 40 U.S.C. § 490(h)(1). Executive Order 12072 was enacted under the authority of this Act. *Birmingham Realty Co. v. General Services Admin.*, 497 F.Supp. 1377, 1386 (N.D.Ala.1980) (footnote omitted); 40 U.S.C. 486(a). In the process of meeting federal space needs in urban environments, including the acquisition of leased space, Executive Order 12072 requires GSA and its client agencies to give "first consideration to a centralized community business area and adjacent areas of similar character, including other specific areas which may be recommended by local officials."[8] Executive Order §§ 1–103, 1–201, and 1–302; *see also* 41 C.F.R. 101–17.205(f) (1992); 56 Fed.Reg. 42,168 (1991).

■ First consideration means first consideration and we therefore believe that the plain and unambiguous meaning of "first consideration" requires GSA and its client agencies to accord a preference to central business areas in the process of meeting federal space needs. *See Jane D. v. Social Security*

*Admin.*, No. 87–1867, 1987 WL 25625, at *4 (E.D.La. Nov. 30, 1987) (To permit an agency to consider a wealthy suburb over the central business area of a city would "wholly, unreasonably, and impermissibly misconstrue the obvious meaning ... of Executive Order 12072."). This interpretation is in accord with GSA's contemporaneous and consistent construction of the language in section 1–103,[9] which is entitled to considerable weight. *See, e.g., Watt v. Alaska*, 451 U.S. 259, 272–73, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981); *United States v. National Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 718–19, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975); *Leary v. United States*, 395 U.S. 6, 25, 89 S.Ct. 1532, 1542, 23 L.Ed.2d 57 (1969).

Finally, we note that the Executive Order was signed by former President Carter, who intended "to move jobs and people and opportunities and growth down to formerly abandoned central city areas or those that were being abandoned in a slow and inexorable way." Remarks on Signing Four Executive Orders Implementing Urban Programs, 14 Weekly Comp. Pres. Doc. 1427–28 (Aug. 16, 1978). Thus, such an interpretation is consistent with the purpose of Executive Order 12072.[10] In light of the scope of our

---

relevant evidence necessary to making an effective decision.

8. The parties do not dispute that Reading's central business area, where the five agencies affected by the relocation: the Department of Labor, Wage and Hour Division and its Bureau of Apprenticeship and Training; SSA; BATF; DCMAO; and the IRS, were previously located at RACC; is a central business area within the meaning of Executive Order 12072 § 1–103. Additionally, there is no dispute that the West Reading/Wyomissing area, where GSA decided to relocate the five agencies, is not such an area under section 1–103. This conclusion is implicit in the parties' arguments. See Defendant's Brief, section III(C)(3); Plaintiff's Brief, section I; and the Intervenor's Brief, section II(A).

9. GSA's contemporaneous construction of Executive Order 12072 was that space needs could be met outside of a city's central business area only in limited circumstances. See 45 Fed.Reg. 37,-200–01 (1980). In the preface to the first set of regulations, GSA declared that "it was not feasible to eliminate preference for centralized business areas of central cities and, at the same time, remain in compliance with the Executive Order." *Id.* at 37,200. Although GSA's current Federal Property Management regulations are less specif-

ic, they do not purport to change its prior interpretation. The current regulations similarly require an agency to give "first consideration" to central business areas when locating Federal office space, and command GSA to review agency compliance. See 41 C.F.R. § 101–17.205(f) (1992). Additionally, GSA has consistently argued in the past that a preference for central business areas is entirely proper under the Executive Order. *See, e.g., Hamco Management*, B–205233, June 22, 1982, 82–1 CPD ¶ 614; *Hensler*, B–195501, May 23, 1980, 80–1 CPD ¶ 356; *Fairplain Dev. Co.*, B–192483, April 24, 1980, 80–1 CPD ¶ 293.

10. Moreover, if central business areas were required to compete in the federal lease solicitation process on an equal basis with suburban locations, there would be no need for the Executive Order. *Cf. Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 412–13, 91 S.Ct. 814, 821–22, 28 L.Ed.2d 136 (1971) ("[I]f congress intended these factors to be on an equal footing with the preservation of parkland there would have been no need for the statutes.... [T]he very existence of the statutes indicates that protection of parkland was to be given paramount importance."). Here, the Executive Order makes the preservation and revitalization of our

review, we must, accordingly, determine whether GSA considered the preference in favor of Reading's central business area *before making a decision* to relocate the five agencies: the Department of Labor, Wage and Hour Division and its Bureau of Apprenticeship and Training; SSA; BATF; DCMAO; and the IRS; from the East Shore Office Building at RACC to the West Reading/Wyomissing area.

Our interpretation of the meaning of "first consideration," as requiring a preference, has the effect of elevating the consideration that must be given to central business areas over other types of areas not specified in section 1–103. Our interpretation should not be taken as more than this or suggesting for instance that a greater priority attaches to "first consideration" of central business areas than to the other factors required to be considered by the Executive Order. See Executive Order 12072 §§ 1–104, 1–105, 1–106, and 1–203. Of course, the plain meaning and purpose of the Executive Order requires that these other factors be considered in light of the preference for a central business area location.[11]

██ One of the other factors requires GSA to "consider the efficient performance of the missions and programs of the agencies, the nature and function of the facilities involved, the convenience of the public served, and the maintenance and improvement of safe and healthful working conditions for employees" with an eye toward a central business area location. Executive Order 12072 § 1–203(a). Presumably, pursuant to section 1–203(a), GSA contends that Reading's proposed sites for relocation in Reading's central business area were reviewed and determined to be incapable of meeting the agencies' basic minimum needs before reaching the decision to relocate the five agencies to the West Reading/Wyomissing area. GSA relies upon the negotiations among Reading, RACC, and itself, which took place from February 15, 1991 until July 15, 1991, as evidence that the

proposed sites were considered for their capability of meeting the agencies minimum needs. Defendant's Brief, section III(C)(3).

The Administrative Record belies that the proposed sites were ever considered for such a determination. As we discussed above, on February 15, 1991, representatives of Reading, RACC, and GSA met to discuss how GSA could accommodate RACC's need to expand into space leased to five of the agencies. GSA had lease rights to occupancy, on behalf of its client agencies, for another five years at a very favorable rental rate. At this meeting, GSA agreed to cede its lease rights to occupancy, on behalf of its client agencies, and to relocate the agencies within the central business area of Reading if space could be provided at no cost to the government. The basis for this no-cost requirement was GSA's position that its duty to the public prohibited terminating such a low-cost lease merely because RACC had found a more favorable use for the space.

Three proposed sites in Reading's central business area were submitted to GSA for consideration. However, GSA determined that the proposals did not meet its requirement of relocation with no cost to the taxpayer. The proposals were unacceptable because the rental rates were significantly higher than the rates in its current lease with RACC, included no relocation costs, and covered only a part of the requisite alteration costs. Administrative Record, No. 11.

In its letter of July 15, 1991, GSA informed RACC and Reading that the majority of the agencies had determined that if relocation was necessary, their missions could best be performed from a locational base in the West Reading/Wyomissing area. GSA's purpose for this correspondence was to seek consideration from RACC, after the plan for a no-cost move had failed, for ceding its rights under the lease for the remaining five-year period.

Nation's cities of similar paramount importance. Executive Order 12072 § 1–101.

11. In the process of meeting federal space needs, there are obviously many other legitimate concerns, which are mentioned in the Executive Order, that must be considered. These concerns must first be addressed in light of the preference for a central business area. If they cannot be met in a central business area, then other areas may be looked at.

Thus, the Administrative Record indicates that the proposed sites were considered solely in terms of satisfying GSA's no-cost requirement.[12] There is no evidence in the Record that the proposed sites were ever considered for their capability of meeting the agencies minimum needs in terms of efficient performance of the mission, convenience of the public served, and the safe and healthful working conditions for employees, as required by Executive Order 12072 § 1–203(a).

Neither GSA's review of the proposed sites on a no-cost basis, nor its formal procurement process, which limited bids to a location "outside city center," is inherently improper, the problem is the failure to give preferential consideration to Reading's central business area as required by the Executive Order.[13] GSA's cooperation in facilitating RACC's expansion plans was understandable and laudable, but its limited review of Reading's central business area did not satisfy its legal obligation to consider the preference in favor of Reading's central business area after the plan for a no-cost move had failed.

 GSA also claims that it accorded a preference in favor of Reading's central business area by considering whether the area was capable of meeting the government's minimum needs. GSA relies upon the agency justifications submitted in support of their recommendations for a relocation area. Executive Order 12072 requires GSA to consult with its client agencies and consider their recommendations for a proposed selection

site or space acquisition. Executive Order 12072 § 1–203(c). Additionally, GSA's regulations, implementing Executive Order 12072, require GSA to obtain agency justifications for a geographical preference outside of a central business area, in whole or part, and to review such justifications before making a decision to relocate outside of such an area. 41 C.F.R. § 101–17.205(f) (1992); *see also* 56 Fed.Reg. 42,168 (1991).

During various periods in 1990 and 1991, GSA conducted a review of the requirements for each of the five agencies affected by the relocation as required by Executive Order 12072 § 1–201(c). In these reviews, each of the agencies identified its space requirements and indicated a delineated geographical area within which the agencies desired to locate. Four of the agencies recommended geographical preferences that were outside of the Reading's central business area in whole or part. However, by the end of August of 1991, when GSA had reached a final decision to relocate the five agencies to the West Reading/Wyomissing area, only SSA and the IRS had submitted justifications to GSA in support of their recommendations for a geographical preference.[14] Administrative Record, Nos. 1–6. We must find, therefore, that GSA failed to obtain and review the requisite justifications from DCMAO and BATF before making its actual decision to relocate the agencies outside of Reading's central business area, in violation of 41 C.F.R. § 101–17.205(f) (1992).[15] Accordingly, we are compelled to find that there is no

12. Additionally, as we have already noted, in July of 1991, GSA had ascertained that the United States Bankruptcy Court for the Eastern District of Pennsylvania would be expanding into a portion of the space included in the proposed site for the Madison Building. Thus, GSA determined that this location was no longer available as a possible site for relocation.

13. If relocating the five agencies at no cost to the government was a budgetary constraint that GSA had to work within, it would have been entirely proper for GSA to review the proposed sites on this basis and, upon finding Reading's central business area could not satisfy this constraint, to then look outside of the area. The problem is that when GSA began considering a location outside of Reading's central business area during the formal procurement process, it neglected to impose the no-cost constraint on the potential bidders.

14. We note that the Department of Labor was not required to submit any justifications for its Wage and Hour Division and Bureau of Apprenticeship and Training because its recommendation for a geographical preference was for Reading's central business area. See 41 C.F.R. § 101–17.205(f) (1992).

15. On January 10, 1992, well after GSA had finalized its decision to relocate to the West Reading/Wyomissing area, DCMAO provided a thorough explanation of its geographical preference to relocate outside of Reading's central business area, if it could not remain at RACC. The Administrative Record does not reveal BATF ever provided any justifications to GSA in support of its recommendation.

evidence in the Record that GSA considered whether Reading's central business area was capable of meeting the minimum needs of DCMAO and BATF.[16]

GSA did obtain and review the justifications of SSA and the IRS. This review is evidenced in various correspondence, in which GSA explained that three of the agencies had determined that their missions could best be performed from a locational base in the West Reading/Wyomissing area.[17] Administrative Record, No. 8, 11. The IRS justified its recommendation to GSA by stating its intent in choosing this area was:

> to provide a quality working environment that is convenient, pleasant and functional for both our employees and our taxpayer customers. We have found the current location and facilities not to be in accord with these desires and we therefore are interested in locating our office to an area that is more in tune with our agency mission.

Administrative Record, No. 6. The Record does not indicate that GSA provided any evaluation of the IRS's justifications, or how they influenced GSA's decision to relocate the IRS outside of Reading's central business area. *Cf. Getty v. Federal Sav. and Loan Ins. Corp.*, 805 F.2d 1050, 1057 (D.C.Cir. 1986).

■ In reviewing GSA's decision, we must make a searching and careful inquiry to determine if GSA actually did consider the preference in favor of Reading's central business area. *Id.* at 1055 (citation omitted). Although the IRS's justifications are broadly stated in terms of mission, convenience of the

public served, and healthful working conditions of employees, their justifications are somewhat lacking in substance. The mere review of such conclusory justifications by GSA without any further explanation or evaluation in the Record can not sufficiently satisfy us that GSA actually considered whether Reading's central business area was capable of providing a "quality work environment that is convenient, pleasant and functional," i.e. capable of meeting the minimum needs of the IRS.[18] We stress that in an informal adjudication, the APA neither requires formal findings, nor that any particular procedure be followed. *Id.* Nevertheless, even in an informal adjudication, an agency must provide the court with some explanation sufficient to properly carry out its review. *Id.* (citations omitted).

■ We reach a completely different result as to GSA's review of SSA's justifications. SSA justified its recommendation to GSA by stating that:

> the majority of its service area population resides in an area encompassed by Muhlenberg, Spring, Cumru, and Exeter townships. A survey of visitors indicates that 75% arrive by car, with the remaining visitors relying on public transportation or walking to the office.
>
> . . . .
>
> [Thus,] [a]ccess to ample parking and public transit is critical to enable us to provide service to the public.

Administrative Record, No. 3. Although the Record does not show that GSA provided any further evaluation of SSA's justifications, their impact on GSA's decision is self-evi-

---

**16.** Additionally, there is no evidence in the Record that GSA considered the Department of Labor's recommendation for a geographical preference *inside* of Reading's central business area as required by Executive Order 12072 § 1–203(c).

**17.** There is a reference in the Record to a third agency that provided justifications *before* GSA made its decision to relocate. We have searched the Administrative Record in vain for any indication of justifications provided by agencies other than SSA and the IRS. But, the Record reveals that the only other agency that provided justifications was DCMAO and these were given on January 10, 1992, after GSA had decided to relocate.

**18.** We note that our review is limited to procedure, and our job is not to judge either the adequacy of the detail, or the persuasiveness of the IRS's justifications. We deal with the substance of the justifications only because GSA has relied upon these justifications in support of the contention that it accorded Reading's central business area the requisite preference by considering whether the agencies' minimum needs could be met in this area. Therefore, for GSA to stand upon its review of such justifications, without any further evaluation or explanation for its actions in the Record, it follows that the justifications themselves must have sufficient substance to satisfy the procedural requirement of "first consideration" under the Executive Order.

dent. Based on GSA's review of these justifications, we are satisfied that GSA actually considered whether Reading's central business area was capable of meeting the minimum needs of SSA. Accordingly, out of the five agencies affected by the relocation, GSA considered the requisite preference in favor of Reading's central business area solely as to one agency, SSA. Unfortunately for GSA, as discussed below, GSA's method of consideration was not fully in compliance with the Executive Order.

The Executive Order requires, as an element of "first consideration" that GSA "[c]onsult with appropriate Federal, State, regional, and local government officials and consider their recommendations for and *objections* to a proposed selection site or space acquisition." Executive Order 12072 § 1–203(c) (emphasis added); *see also Birmingham Realty Co. v. General Services Admin.,* 497 F.Supp. 1377, 1386 (N.D.Ala.1980). GSA contends that it consulted with Reading officials before deciding to relocate the five agencies to the West Reading/Wyomissing area.

However, the Administrative Record reveals that after the plan for a no-cost move had failed, Reading was completely foreclosed from the process of deciding where to relocate the five agencies. In a letter, dated July 15, 1991, GSA informed RACC and Reading that the majority of the agencies had determined that if relocation was necessary, their missions could best be performed from a locational base in the West Reading/Wyomissing area. Administrative Record, No. 8. After July 15, 1991, the Record provides no indication that GSA ever consulted with Reading before making the decision to relocate. On August 1, 1991, GSA placed an advertisement in the Reading Eagle Times newspaper requesting listings for 30,-000 net usable square feet of space in the West Reading/Wyomissing area. Administrative Record, No. 10. On August 28, 1991, GSA issued Solicitation No. MPA 91194 to lease 30,000 net usable square feet of office space in West Reading/Wyomissing, Pennsylvania. Administrative Record, No. 12. The location sought in the Solicitation is summarized as "outside City Center." *Id.* at ¶ 1.3. There is no evidence in the Record that

Reading was either directly informed about, or provided a copy of the Solicitation. On September 25, 1991, GSA conducted a market survey of available office space in Wyomissing, Pennsylvania. Administrative Record, No. 13. On March 11, 1992, GSA entered into a lease with Hough/Loew Associates, Inc., for 30,000 net usable square feet of office space on the first floor of Berkshire Knoll, located at 1125 Berkshire Boulevard in Wyomissing. Administrative Record, No. 17. The Record does not indicate that GSA notified Reading directly that it had signed a lease with Hough/Loew. In short, GSA failed to afford Reading a proper opportunity to respond to the proposed relocation outside of Reading.

In explaining GSA's locational policy, the Regional Administrator of GSA, George P. Cordes, indicated to Reading that the client agencies would be required to justify their move to a suburban location and that Reading would have an opportunity to respond to their justifications before a decision was reached to relocate outside of Reading. *See* Administrative Record, Nos. 18, 20. But, the Record reveals that in spite of this assurance GSA failed to consult with Reading and consider the City's objections to the proposed relocation area before making its decision, as required by section 1–203(c) of the Executive Order.

Further, if the objections are to be anything more than mere superficial objections, the consultations under section 1–203(c) of the Executive Order must be read as requiring GSA to provide any information, used in the process of deciding how to meet federal space needs, to the appropriate officials before making a final decision. Executive Order 12072 § 1–203(c). This requirement is consistent with the fully informed and well-considered decision contemplated by the Executive Order. Indeed, GSA's own regulations, implementing Executive Order 12072, seem to also suggest that GSA has an obligation to provide such information. 41 C.F.R. § 101–17.205(e) (1992) states, in pertinent part, that "GSA will advise local officials of the availability of data on GSA plans and programs, and will agree upon the exchange of planning information with local officials."

In making the decision to relocate the agencies to the West Reading/Wyomissing area, the Administrative Record indicates that GSA primarily relied upon the recommendations for a geographical preference submitted by SSA, BATF, DCMAO, and the IRS, and also the justifications SSA and the IRS provided in support of their recommendations. The Executive Order required GSA to forward this information to Reading before making its decision in order to afford Reading an opportunity to provide meaningful objections to the proposed relocation area. Despite GSA's legal obligation, Reading did not receive any such information until May 15, 1992, two months after a suburban lease was signed. At this time, Reading received for the first time, written justifications from GSA in support of the geographical preferences of SSA, DCMAO, and the IRS. *See* Administrative Record, No. 20. The City forwarded its rebuttal to these justifications to GSA on June 1, 1992. Reading did not receive any justifications from BATF, which had furnished none to GSA.

In sum, the Administrative Record establishes that GSA failed to gave "first consideration" to Reading's central business area before making the decision to relocate the five agencies to the West Reading/Wyomissing area, in violation of Executive Order 12072 and its own implementing regulations. The Executive Order contemplates that GSA will weigh and balance the numerous factors to be considered along with the recommendations and objections in a thorough and exacting analysis to reach an informed and well-considered decision. GSA's consideration of the preference in favor of Reading's central business area falls far short of the reasoned consideration intended by the Executive Order. Accordingly, we are constrained to hold on the Record before us that GSA's decision to relocate the five agencies to the West Reading/Wyomissing area was an abuse of discretion or otherwise not in accordance with the law under 5 U.S.C. § 706(2)(A).[19]

■ We recognize that the APA authorizes injunctive relief to set aside agency action that is an abuse of discretion or otherwise not in accordance with the law. *See Hondros v. United States Civil Serv. Comm'n,* 720 F.2d 278, 297–98 (3d Cir.1983). However, the APA specifically provides that it does not affect the power or duty of a court to dismiss any action or deny relief on any other legal or equitable ground. 5 U.S.C. § 702. We turn, therefore, to consider the equitable defense of laches and Reading's entitlement to an injunctive remedy.

## D. LACHES AND REMEDY

■ GSA argues that the equitable defense of laches bars Reading from obtaining relief. The defense of laches is based on the assumption that "the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless, or have been abandoned; and that because of the changing conditions or relations during the period of delay it would be an injustice to the latter to permit him to now assert them." *Galliher v. Cadwell,* 145 U.S. 368, 372, 12 S.Ct. 873, 874, 36 L.Ed. 738 (1892). Thus, the elements of the defense of laches are " '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.' " *Equal Employment Opportunity Comm'n v. Great Atlantic & Pacific Tea Co.,* 735 F.2d 69, 80 (3d Cir.1984) (quoting *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961)). A delay may be excused upon a showing that the party asserting the defense substantially contributed to the delay through concealment, misrepresentation, unfilled promises, or any other inequitable conduct. *See Gruca v. United States Steel Corp.,* 495 F.2d 1252, 1259–60 (3d Cir.1974). Additionally, the delay must be the cause of the prejudice to the party asserting the defense. *Waddell v. Small Tube Prod., Inc.,* 799 F.2d 69, 76 (3d Cir. 1986).

19. In light of our holding, we need not consider Reading's additional ground for setting aside GSA's decision for improperly restricting competition in violation of 41 C.F.R. 101–18.100(c) (1992).

The defense of laches necessitates "a close scrutiny of the particular facts and a balancing of the respective interests and equities of the parties, as well as of the general public." [20] *Country Floors, Inc. v. Partnership of Gepner and Ford,* 930 F.2d 1056, 1066 (3d Cir.1991) (citation omitted). Thus, the Third Circuit has stated that the correct disposition of the defense of laches typically requires a full hearing on the merits. *Id.* We find, in the instant case, that the correct disposition of the defense of laches requires such a full hearing.

■ Key factual issues affecting the first element of the laches defense concern the point in time when Reading actually knew or should have know of GSA's decision to relocate the five agencies to the West Reading/Wyomissing area and when it became unreasonable for Reading to rely on GSA's promise of an opportunity to respond to the agencies' justifications before filing suit. *Cf. Waddell v. Small Tube Prod., Inc.,* 799 F.2d at 77 (whether reasonable person would have realized that no administrative solution was forthcoming required an ad hoc determination). The determination of whether or not a delay is excusable "'comprehends both the application of a legal standard and an exercise of the trial court's sound discretion in assessing the equitable circumstances of a particular case.'" *Id.* (citation omitted). This case appears to be an appropriate situation to exercise that discretion.

With respect to the second element, the parties dispute the extent of the prejudice as to GSA and the Intervenor, Hough/Loew Associates, Inc., as well as the public's interest. Additionally, GSA was well aware that Reading was pursuing a resolution of its concerns through its elected representatives. A party cannot assert the defense of laches merely because it has sustained prejudice despite having knowledge that a claim was imminent. *See Bernard v. Gulf Oil Co.,* 596 F.2d 1249, 1257 (5th Cir.1979) (citation omitted). In the instant case, therefore, factual issues also exist about the extent to which any prejudice

to GSA was caused by Reading's delay in bringing this suit as opposed to any prejudice to GSA which may be attributable to GSA's own actions in proceeding to relocate the five agencies in the face of unresolved concerns. Moreover, it is unclear whether Hough/Loew also had such knowledge. If it did, this issue could also be relevant to a determination of the extent of Hough/Loew's prejudice. Clearly, the existence of laches cannot be determined on summary judgment with the present record.

Much like the disposition of laches, whether Reading is entitled to an equitable remedy requires a balancing of the respective interests, the equities of the parties, and the public interest. Accordingly, it follows that summary judgment is also inappropriate as to this issue.

An appropriate order follows.

### ORDER

AND, NOW this 17th day of March, 1993, upon consideration of the parties' CROSS-MOTIONS, MEMORANDA IN SUPPORT THEREOF, AS WELL AS ALL THE RESPONSES AND REPLIES THERETO, it is hereby ORDERED that:

1. the PLAINTIFF, CITY OF READING'S CROSS-MOTION FOR SUMMARY JUDGMENT, filed on November 18, 1992, is **DENIED** without prejudice as to the issue of laches and Reading's entitlement to an equitable remedy and **GRANTED** as to the remaining issues in accordance with our Opinion;

2. the DEFENDANT, RICHARD G. AUSTIN'S MOTION TO DISMISS, or in the alternative, MOTION FOR SUMMARY JUDGMENT, filed on October 21, 1992, is **DENIED**; and

3. the INTERVENOR, HOUGH/LOEW ASSOCIATES, INC.'S MOTION TO DISMISS, or in the alternative, MOTION FOR

---

**20.** We noted above that Reading may assert its own interest as well as the public's interest in vindicating its injury. In applying the defense of laches, we must, therefore, also take into account the public's interest. *Country Floors, Inc. v. Part-* *nership of Gepner and Ford,* 930 F.2d 1056, 1066 (3d Cir.1991) (citation omitted); *cf. Equal Employment Opportunity Comm'n v. Great Atlantic & Pacific Tea Co.,* 735 F.2d 69, 81 (3d Cir.1984).

SUMMARY JUDGMENT, filed on November 17, 1992, is **DENIED.**

4. The parties are further **ORDERED** to complete any necessary discovery within 90 days from the date of this Order, following which this Court will hold a hearing.

5. This is not a final order and for that reason we withhold entering judgment until said hearing.